UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| WILLIAM SALIER, KARLA SALIER, | : | |
| | : | |
| Plaintiffs, | : | Dkt. No.: 0:22-cv-00082 |
| v. | : | |
| | : | |
| WALMART, INC.; HY-VEE, INC., | : | |
| | : | |
| Defendants. | : | February 3, 2022 |

## AMENDED COMPLAINT

1.  This is an action for compensatory and punitive damages against two pharmacies who substituted politics and corporate policies for a doctor's judgment as to what was best for her patients and denied them life-saving medicine, forcing them to take horse paste to save their lives.

### *Jurisdiction & Venue*

2.  This Court has jurisdiction under 28 U.S.C. §§ 1332 because complete diversity of citizenship exists between the parties and the Plaintiffs seek more than $75,000 in damages.

3.  Venue is appropriate under 28 U.S.C. § 1391 because the events described herein occurred within this Court's jurisdiction.

### *Parties*

4.  Plaintiff William Salier is an adult citizen of Minnesota who continuously lives in and maintains his sole and permanent home in Minnesota and has done so prior to and during all relevant times described herein. He is a United States Marine Corps veteran who served his country honorably, including in Operation Restore Hope and as part of presidential security at Camp David, Maryland. He is also a former candidate for the United States Senate in Iowa and a former, full-time Iowa farmer.

1

5. Plaintiff Karla Salier is an adult citizen of Minnesota who continuously lives in and maintains her sole and permanent home in Minnesota and has done so prior to and during all relevant times described herein.

6. Defendant Walmart, Inc. (hereinafter, "Walmart") is a publicly traded corporation incorporated under the laws of Delaware and headquartered in Bentonville, Arkansas. It maintains retail stores across the United States including in Minnesota.

7. Upon information and belief, Defendant Hy-Vee, Inc. is a privately held corporation incorporated under the laws of Iowa (Business No. 19862) and headquartered in West Des Moines, Iowa. It maintains retail stores across the United States including in Minnesota.

### *Factual Allegations*
### *The Saliers' Plight*

8. On October 1, 2021, William Salier began to feel sick. Like any reasonable citizen, he obtained a COVID-19 test, which revealed that he was sick with COVID-19.

9. As a former Marine and farmer who has always cared for himself physically, William Salier quarantined himself for what he assumed would be a quick recovery.

10. COVID-19, however, had different plans. Within a few days, William Salier found himself bed-ridden. He lost all sense of taste or smell, and he quickly began to experience severe shortness of breath.

11. As his condition steadily worsened, William and Karla Salier began to seek treatment. They applied for monoclonal antibody treatments through the Minnesota Resource Allocation Platform, but their requests went unanswered.

12. Undaunted, Karla Salier transported her husband to a clinic in Osage, Iowa to see if they would treat him with antibodies or Ivermectin. The clinic, however, informed them that, despite William's condition steadily worsening, he was not sick enough for them to treat him with monoclonal antibodies because they were reserving the last of their supply for someone in even worse condition. The Saliers then inquired about Ivermectin, but the attending physician declined to prescribe it for William.

13. The Saliers returned home where William's situation continued to worsen to the point where they began to fear for his life.

14. After further research and significant persistence, the Saliers obtained a telehealth appointment with Dr. Mollie James – a Missouri doctor who has successfully treated countless COVID-19 patients.

15. Dr. James quickly realized that William's condition was extremely serious and that he was on the verge of requiring intensive care unit treatment, which would leave him with less than a 50% chance of survival, unless he received effective treatment immediately.

16. She wrote William a prescription for several treatments including Ivermectin, and she sent it to the Walmart pharmacy in Albert Lea, Minnesota.

17. Walmart's pharmacist called Karla Salier to inform her that Walmart refused to fill Dr. James' prescription of Ivermectin, stating that it was not appropriate to treat COVID-19 patients with it.

18. Karla Salier informed him that her husband was seriously ill and pleaded with him to fill the prescription according to their doctor's orders. Instead of responding politely, Walmart's pharmacist proceeded to lecture her about how Ivermectin was

3

dangerous for her husband despite his doctor's prescription, and he again refused to fill the prescription.

19. Karla Salier informed Dr. James who called the Walmart pharmacist herself and asked him to fill the prescription, explaining that it was safe to treat COVID-19 patients and that he was interfering with her treatment of a critically ill patient. The Walmart pharmacist continued to refuse to fill the prescription and attempted to lecture Dr. James about how she was imperiling the Saliers' health. He then hung up on her.

20. Karla Salier also fell sick with COVID-19, and Dr. James prescribed her ivermectin and hydroxychloroquine, which the same Walmart refused to fill for the same reasons at the same time that it declined to fill William's prescriptions.

21. The Saliers then attempted to have their prescriptions filled at a Hy-Vee supermarket in Albert Lea, Minnesota. Hy-Vee's pharmacist told them that it was its corporate policy to refuse Ivermectin and hydroxychloroquine prescriptions to treat COVID-19. Hy-Vee's pharmacist, however, filled every other prescription that Dr. James issued.

22. With no other options, his doctor warning that his sickness was placing his life in danger, and facing potential death if he did not follow his doctor's instructions, William Salier did what Marines are trained to do: He improvised. Relying on his farming experience, he and Karla purchased the veterinary version of Ivermectin - a tube of horse paste with Ivermectin as its only active ingredient.

23. After calculating the appropriate dosage according to the guidance that Dr. James gave them, Salier and his wife mixed the dosage of horse paste into dishes of

apple sauce and consumed it in multiple doses just as they would consume a regular mediciation.

24. Within 24 hours of regularly consuming Ivermectin horse paste, Salier and his wife noticed a rapid and significant improvement in their conditions.

25. After a week of consistently self-treating themselves with Ivermectin horse paste, both had recovered sufficiently to resume their normal activities with some moderate limitations.

26. After two weeks, both had resumed their normal lives.

27. Neither William or Karla Salier experienced any negative health problems from Dr. James' prescriptions.

### *Prescriptions For "Off-Label" Use Are Common And Relatively Non-Controversial In The United States*

28. Prescriptions for "off-label" use occur when a doctor prescribes an FDA-approved drug for an unapproved use.[1]

29. No federal law prohibits physicians for issuing prescriptions for "off-label" use.

30. The U.S. Federal Drug Administration (FDA) takes the position that healthcare providers generally may prescribe the drug for an unapproved use when they judge that it is medically appropriate for their patients.[2]

31. In fact, it has taken the position in formally issued guidance that "[g]ood medical practice and the best interests of the patient require that physicians use legally

---

[1] https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label
[2] https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label

available drugs, biologics and devices according to their best knowledge and judgement."[3]

32. According to a February 23, 2021 Congressional Resarch Service Report, data from 2006 shows that approximately 21% of prescriptions in the United States are issued for off-label uses. *See* **Exhibit A, p. 2**. A 2016 Canadian study founds that approximately 12% of prescriptions are issued for off-label uses. *Id*. at p. 2. A 2018 study estimated that the number was closer to 38%. *Id*. at p. 3. Finally, according to another 2018 study, the number is much higher in the field of oncology where 56% of prescriptions were for off-label uses. *Id*. at p. 3.

33. Examples of off-label use range from treatments of minor ailments to cancer:

> a. The FDA has approved gabapentin for epilepsy seizures, but it has also been used "off-label" to treat menopausal hot flashes and bipolar disorder. *Id*. at p. 5.
>
> b. The FDA has approved ketamine as an anesthetic, but it is also used "off-label" to treat migraines and depression. *Id*. at p. 5.
>
> c. The FDA has approved fentanyl to manage breakthrough pain in cancer patients who are opiod tolerant, but it has also been used "off-label" to manage less severe or chronic pain in individuals who are not opioid tolerant. *Id*. at p. 5.

---

[3] https://www.fda.gov/regulatory-information/search-fda-guidance-documents/label-and-investigational-use-marketed-drugs-biologics-and-medical-devices

      d.  The FDA has approved Avastin to treat a number of different cancers including lung cancer, but it is also used "off-label" to treat wet age-related macular degeneration and colorectal cancer. *Id*. at p. 5.

34. In other words, prescriptions for "off-label" usage are a regular part of American medicine.

### Data Shows That Ivermectin Is Safe & Effective.

35. The FDA gave full approval to ivermectin as a safe drug in 1996, and the World Health Organization includes it on its List of Essential Medicines.

36. In 2015, Ivermectin's discoverers won the 2015 Nobel Prize for Physiology or Medicine for discovering Avermectin, which they then modified to create Ivermectin.

37. More than 4 billion doses of Ivermectin have been administered worldwide, and only 28 cases of serious adverse reactions to it have been reported. *See* Pierre Kory, et al., *Review of The Emerging Evidence Demonstrating The Efficacy Of Ivermectin In The Prophylaxis And Treatment Of COVID-19*, American Journal of Therapeutics, Vol. 28, Issue 3, pp. e299-e318 (May/June 2021).

38. Ivermectin is effective in inhibiting at least 21 viruses, including HIV-1, dengue, Zika, the West Nile Virus, and COVID-19. *See* David A. Jans and Kylie M. Wagstaff, *The Broad Spectrum Host-Directed Agent Ivermectin As An Antiviral For SARS-COV-2?* Biochemical and Biophysical Research Communications, Vol. 538, pp. 163-172 (Jan. 29, 2021).

39. While the National Institute of Health has delayed its stamp of approval to Ivermectin as a COVID-19 treatment for political reasons, studies have demonstrated Ivermectin's overwhelming efficacy against COVID-19, including studies that have shown that it reduces the active viral load of COVID-19 in cells by 99.8% in 24 hours

and 99.98% in 48 hours. *See* Leon Caly, et al., *The FDA-approved Drug Ivermectin Inhibits The Replication Of SARS-COV-2 In Vitro*, Journal Of Antiviral Research, Vol. 178 (Jun. 2020); *see also* Pierre Kory, et al., *Review of The Emerging Evidence Demonstrating The Efficacy Of Ivermectin In The Prophylaxis And Treatment Of COVID-19*, American Journal of Therapeutics, Vol. 28, Issue 3, pp. e299-e318 (May/June 2021).

**Count One – Violation of William Salier's Common Law Right To Self Determination Against Defendant Walmart, Inc.**

40. Paragraphs 1 through 40 are incorporated herein.

41. Under Minnesota law, every person enjoys a common law right to self-determination. *Cornfeldt v. Tongen*, 262 N.W.2d 684 (Minn. 1977). A corollary of this right is the common law right of "every adult of sound mind to determine what shall be done with his own body." *Id*. at 701.

42. Defendant Walmart, Inc. had no reasonable medical or scientific basis for declining to fill William Salier's prescription for Ivermectin for the sole reason that his doctor had prescribed it to treat COVID-19.

43. Defendant Walmart, Inc.'s refusal to fill William Salier's prescription endangered his life and forced him to improvise with a version intended for horses, not humans, to save his own life.

44. Defendant Walmart, Inc. violated William Salier's right to self-determination by declining to provide him the safe and effective treatment – Ivermectin – that his doctor prescribed simply because it chose to replace his doctor's reasoned judgment and his own reasoned decisionmaking with baseless political conclusions.

**Count Two – Violation of Karla Salier's Common Law Right To Self Determination Against Defendant Walmart, Inc.**

45. Paragraphs 1 through 44 are incorporated herein.

46. Under Minnesota law, every person enjoys a common law right to self-determination. *Cornfeldt v. Tongen*, 262 N.W.2d 684 (Minn. 1977). A corollary of this right is the common law right of "every adult of sound mind to determine what shall be done with his own body." *Id*. at 701.

47. Defendant Walmart, Inc. had no reasonable medical or scientific basis for declining to fill Karla Salier's prescription for Ivermectin and hydroxychloroquine for the sole reason that her doctor had prescribed it to treat COVID-19.

48. Defendant Walmart, Inc.'s refusal to fill Karla Salier's prescription endangered her life and forced her to improvise with a version intended for horses, not humans, to treat a serious illness – COVID-19.

49. Defendant Walmart, Inc. violated Karla Salier's right to self-determination by declining to provide her the safe and effective treatment – Ivermectin and hydroxychloroquine – that her doctor prescribed simply because it chose to replace her doctor's reasoned judgment and her own reasoned decisionmaking with baseless political conclusions.

**Count Three – Intentional Infliction Of Emotional Distress On William Salier Against Defendant Walmart, Inc.**

50. Paragraphs 1 through 49 are incorporated herein.

51. William Salier's doctor, Dr. Mollie James, diagnosed him with a severe case of COVID-19 and informed him that he was on the verge of requiring intensive care unit treatment, which would have left him with less than a 50% chance of survival.

His only hope to avoid this turn for the worst was to receive effective treatment immediately.

52. In Dr. James' reasoned and qualified judgment, effective treatment consisted of several treatments, including Ivermectin. William Salier had every reason to trust her judgment as, upon information and belief, none of her patients has died from COVID-19 and his own suffering showed him how close he was to the intensive care unit.

53. Defendant Walmart's intentional and reckless refusal to fill William Salier's prescription because it called for Ivermectin to treat COVID-19 – even after Karla Salier and Dr. James informed it that William Salier was critically ill – constitutes extreme and outrageous conduct because it substituted its political judgments for Dr. James' reasoned and qualified judgment at the risk of William Salier's life.

54. Defendant Walmart also rudely lectured Karla Salier and Dr. James about how they were endangering William Salier's health despite their efforts to inform it of how ill William Salier was and the efficacy of the prescribed treatment.

55. Defendant Walmart's conduct caused severe emotional distress to William Salier by causing him to fear for his life and agonize on where he could obtain the life-saving treatment that his doctor ordered.

**Count Four – Intentional Infliction Of Emotional Distress On Karla Salier Against Defendant Walmart, Inc.**

56. Paragraphs 1 through 55 are incorporated herein.

57. After Dr. Mollie James diagnosed William Salier – Karla Salier's husband – with a severe case of COVID-19, Dr. James informed him and Karla Salier that he was on the verge of requiring intensive care unit treatment, which would have left him

with less than a 50% chance of survival. Their only hope to avoid this turn for the worst was for William Salier to receive effective treatment immediately.

58. In Dr. James' reasoned and qualified judgment, effective treatment consisted of several treatments, including Ivermectin. Karla Salier had every reason to trust her judgment as, upon information and belief, none of her patients has died from COVID-19 and her husband's own suffering showed her how close he was to the intensive care unit.

59. Additionally, Karla Salier contracted COVID-19 herself, and Dr. James prescribed Ivermectin and hydroxychloroquine for her.

60. Defendant Walmart's intentional and reckless refusal to fill William Salier's prescription because it called for Ivermectin to treat COVID-19 – even after Karla Salier and Dr. James informed it that William Salier was critically ill – constitutes extreme and outrageous conduct because it substituted its political judgments for Dr. James' reasoned and qualified judgment at the risk of William Salier's life.

61. Defendant Walmart's intentional and reckless refusal to fill Karla Salier's prescription because it called for Ivermectin and hydroxychloroquine to treat COVID-19 constitutes extreme and outrageous conduct because it substituted its political judgments for Dr. James' reasoned and qualified judgment at the risk of Karla Salier's health.

62. Defendant Walmart's paternalist and rude lecture to Karla Salier about how she was endangering William Salier's health despite her efforts to inform it of how ill William Salier was constitutes extreme and outrageous conduct.

63.   Defendant Walmart's conduct caused severe emotional distress to Karla Salier by causing her to fear for her husband's life, agonize over her own health, and despair on where she could obtain the life-saving treatment that her doctor ordered.

**Count Five – Tortious Interference With Contractual Relations On Behalf Of William Salier Against Defendant Walmart, Inc.**

64.   Paragraphs 1 through 63 are incorporated herein.

65.   A contract existed between Dr. Mollie James and William Salier for Dr. James to provide medical treatment to the best of her knowledge, skills, ability, and experience to William Salier. One of William Salier's expectations from this contract was that Dr. James could lawfully prescribe him medicine from pharmacies that he could not obtain otherwise.

66.   Defendant Walmart knew of the existence of this contract by virtue of the prescription that Dr. James sent it to fill on behalf of William Salier.

67.   Defendant Walmart intentionally procured the breach of that contract without justification by substituting its political and fear-driven conclusions in place of Dr. James' knowledge, skills, ability, and experience and denying Dr. James the ability to prescribe a legal medicine for William Salier.

68.   As a result of Defendant Walmart's conduct, William Salier lost the informed aid of Dr. James' assistance to obtain life-saving medicine, and he and his wife were forced to devise a home remedy that could have endangered his health.

**Count Six – Tortious Interference With Contractual Relations On Behalf Of Karla Salier Against Defendant Walmart, Inc.**

69.   Paragraphs 1 through 68 are incorporated herein.

70.   A contract existed between Dr. Mollie James and Karla Salier for Dr. James to provide medical treatment to the best of her knowledge, skills, ability, and

experience to Karla Salier. One of Karla Salier's expectations from this contract was that Dr. James could lawfully prescribe her medicine from pharmacies that she could not obtain otherwise.

71. Defendant Walmart knew of the existence of this contract by virtue of the prescription that Dr. James sent it to fill on behalf of Karla Salier.

72. Defendant Walmart intentionally procured the breach of that contract without justification by substituting its political and fear-driven conclusions in place of Dr. James' knowledge, skills, ability, and experience and denying Dr. James the ability to prescribe a legal medicine for Karla Salier.

73. As a result of Defendant Walmart's conduct, Karla Salier lost the informed aid of Dr. James' assistance to obtain life-saving medicine, and she and her husband were forced to devise a home remedy that could have endangered her health.

### Count Seven – Violation of William Salier's Common Law Right To Self Determination Against Defendant HY-VEE, Inc.

74. Paragraphs 1 through 73 are incorporated herein.

75. Under Minnesota law, every person enjoys a common law right to self-determination. *Cornfeldt v. Tongen*, 262 N.W.2d 684 (Minn. 1977). A corollary of this right is the common law right of "every adult of sound mind to determine what shall be done with his own body." *Id*. at 701.

76. Defendant HY-VEE, Inc. had no reasonable medical or scientific basis for declining to fill William Salier's prescription for Ivermectin for the sole reason that his doctor had prescribed it to treat COVID-19.

77. Defendant HY-VEE, Inc.'s refusal to fill William Salier's prescription endangered his life and forced him to improvise a home remedy intended for horses, not humans, to save his own life.

78. Defendant HY-VEE, Inc. violated William Salier's right to self-determination by declining to provide him the safe and effective treatment – Ivermectin – that his doctor prescribed simply because it chose to replace his doctor's reasoned judgment and his own reasoned decisionmaking with a one-size-fits-all corporate policy based on political fearmongering.

### Count Eight – Violation of Karla Salier's Common Law Right To Self Determination Against Defendant HY-VEE, Inc.

79. Paragraphs 1 through 78 are incorporated herein.

80. Under Minnesota law, every person enjoys a common law right to self-determination. *Cornfeldt v. Tongen*, 262 N.W.2d 684 (Minn. 1977). A corollary of this right is the common law right of "every adult of sound mind to determine what shall be done with his own body." *Id*. at 701.

81. Defendant HY-VEE, Inc. had no reasonable medical or scientific basis for declining to fill Karla Salier's prescription for Ivermectin and hydroxychloroquine for the sole reason that her doctor had prescribed it to treat COVID-19.

82. Defendant HY-VEE, Inc.'s refusal to fill Karla Salier's prescription endangered her life and forced her to improvise a home remedy intended for horses, not humans, to treat a serious illness – COVID-19.

83. Defendant HY-VEE, Inc. violated Karla Salier's right to self-determination by declining to provide her the safe and effective treatment – Ivermectin and

hydroxycholoquinine – that her doctor prescribed simply because it chose to replace her doctor's reasoned judgment and her own reasoned decisionmaking with a one-size-fits-all corporate policy based on political fearmongering.

### Count Nine – Intentional Infliction Of Emotional Distress On William Salier Against Defendant HY-VEE, Inc.

84. Paragraphs 1 through 83 are incorporated herein.

85. William Salier's doctor, Dr. Mollie James, diagnosed him with a severe case of COVID-19 and informed him that he was on the verge of requiring intensive care unit treatment, which would have left him with less than a 50% chance of survival. His only hope to avoid this turn for the worst was to receive effective treatment immediately.

86. In Dr. James' reasoned and qualified judgment, effective treatment consisted of several treatments, including Ivermectin. William Salier had every reason to trust her judgment as, upon information and belief, none of her patients has died from COVID-19 and his own suffering showed him how close he was to the intensive care unit.

87. Defendant HY-VEE's intentional and reckless refusal to fill William Salier's prescription because it called for Ivermectin to treat COVID-19 – even after Karla Salier informed it that William Salier was critically ill – constitutes extreme and outrageous conduct because it substituted its corporate policy for Dr. James' reasoned and qualified judgment at the risk of William Salier's life.

88. Defendant HY-VEE's conduct caused severe emotional distress to William Salier by causing him to fear for his life and agonize on where he could obtain the life-saving treatment that his doctor ordered.

### Count Ten – Intentional Infliction Of Emotional Distress On Karla Salier Against Defendant HY-VEE, Inc.

89.　　Paragraphs 1 through 88 are incorporated herein.

90.　　After Dr. Mollie James diagnosed William Salier – Karla Salier's husband – with a severe case of COVID-19, Dr. James informed him and Karla Salier that he was on the verge of requiring intensive care unit treatment, which would have left him with less than a 50% chance of survival. Their only hope to avoid this turn for the worst was for William Salier to receive effective treatment immediately.

91.　　In Dr. James' reasoned and qualified judgment, effective treatment consisted of several treatments, including Ivermectin. Karla Salier had every reason to trust her judgment as, upon information and belief, none of her patients has died from COVID-19 and her husband's own suffering showed her how close he was to the intensive care unit.

92.　　Additionally, Karla Salier contracted COVID-19 herself, and Dr. James prescribed Ivermectin and hydroxychloroquine for her.

93.　　Defendant HY-VEE's intentional and reckless refusal to fill William Salier's prescription because it called for Ivermectin to treat COVID-19 – even after Karla Salier and Dr. James informed it that William Salier was critically ill – constitutes extreme and outrageous conduct because it substituted its corporate policy for Dr. James' reasoned and qualified judgment at the risk of William Salier's life.

94.　　Defendant HY-VEE's intentional and reckless refusal to fill Karla Salier's prescription because it called for Ivermectin and hydroxychloroquine to treat COVID constitutes extreme and outrageous conduct because it substituted its corporate policy for Dr. James' reasoned and qualified judgment at the risk of Karla Salier's health.

95. Defendant HY-VEE's conduct caused severe emotional distress to Karla Salier by causing her to fear for her husband's life, agonize over her own health, and despair on where she could obtain the life-saving treatment that her doctor ordered.

**Count Eleven – Tortious Interference With Contractual Relations On Behalf Of William Salier Against Defendant HY-VEE, Inc.**

96. Paragraphs 1 through 95 are incorporated herein.

97. A contract existed between Dr. Mollie James and William Salier for Dr. James to provide medical treatment to the best of her knowledge, skills, ability, and experience to William Salier. One of William Salier's expectations from this contract was that Dr. James could lawfully prescribe him medicine from pharmacies that he could not obtain otherwise.

98. Defendant HY-VEE knew of the existence of this contract by virtue of the prescription that Dr. James sent it to fill on behalf of William Salier.

99. Defendant HY-VEE intentionally procured the breach of that contract without justification by substituting its corporate policy in place of Dr. James' knowledge, skills, ability, and experience and denying Dr. James the ability to prescribe a legal medicine for William Salier.

100. As a result of Defendant HY-VEE's conduct, William Salier lost the informed aid of Dr. James' assistance to obtain life-saving medicine, and he and his wife were forced to devise a home remedy that could have endangered his health.

**Count Twelve – Tortious Interference With Contractual Relations On Behalf Of Karla Salier Against Defendant HY-VEE, Inc.**

101. Paragraphs 1 through 100 are incorporated herein.

102. A contract existed between Dr. Mollie James and Karla Salier for Dr. James to provide medical treatment to the best of her knowledge, skills, ability, and

17

experience to Karla Salier. One of Karla Salier's expectations from this contract was that Dr. James could lawfully prescribe her medicine from pharmacies that she could not obtain otherwise.

103. Defendant HY-VEE knew of the existence of this contract by virtue of the prescription that Dr. James sent it to fill on behalf of Karla Salier.

104. Defendant HY-VEE intentionally procured the breach of that contract without justification by substituting its corporate policy in place of Dr. James' knowledge, skills, ability, and experience and denying Dr. James the ability to prescribe a legal medicine for Karla Salier.

105. As a result of Defendant HY-VEE's conduct, Karla Salier lost the informed aid of Dr. James' assistance to obtain life-saving medicine, and she and her husband were forced to devise a home remedy that could have endangered her health.

## Prayer For Relief

WHEREFORE, the Plaintiffs seek declaratory and injunctive relief as follows:

A. Compensatory damages;

B. Punitive damages as permitted by law;

C. Costs and attorneys' fees;

D. Such other relief as the Court deems fair and equitable.

## JURY DEMAND

The Plaintiffs requests trial by jury.

THE PLAINTIFFS

/s/ Marjorie J. Holsten /s/

MAJORIE J. Holsten, ESQ.
Holsten Law office
8525 Edinbrook Crossing, Ste. 210
Brooklyn Park, MN 55443
Tel: 763-420-7034
marjholsten@yahoo.com

/s/ Cameron L. Atkinson /s/

CAMERON L. ATKINSON, ESQ.
*Pro hac vice pending*
PATTIS & SMITH, LLC
383 Orange Street
New Haven, CT 06511
Tel:  (203) 393-3017
Fax: (203) 393-9745
catkinson@pattisandsmith.com