## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

William Salier, Karla Salier,

        Plaintiffs,

v.

Walmart, Inc., Hy-Vee, Inc.,

        Defendants.

Case No. 22-cv-00082-PJS-ECW

**DEFENDANT WALMART INC.'s MEMORANDUM OF LAW IN SUPPORT OF WALMART INC.'s MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

## <u>INTRODUCTION</u>

The Amended Complaint's allegations, accepted as true at the pleading stage, present a straightforward case for dismissal for failure to state a claim upon which relief can be granted. Plaintiffs William and Karla Salier each contracted COVID-19 in October 2021. After telehealth appointments with a Missouri doctor, they obtained prescriptions for ivermectin and hydroxychloroquine. A pharmacist at Defendant Walmart Inc. ("Walmart") refused to fill them, explaining to the Saliers and their doctor that, in his professional judgment, they were not "appropriate to treat COVID-19 patients," were "dangerous," and "imperil[ed] the Saliers' health." After Defendant Hy-Vee, Inc. ("Hy-Vee") similarly refused to fill the prescriptions, the Saliers took a veterinary formulation of ivermectin. They recovered from COVID-19 shortly thereafter with no lingering ill

effects.  Each of the three causes of action William and Karla Salier now bring against Walmart is fundamentally flawed.[1]

*First*, the Saliers inaccurately assert that the Minnesota Supreme Court's decision in *Cornfeldt v. Tongen*, 262 N.W.2d 684 (Minn. 1977), which recognized the tort of negligent nondisclosure of risks attendant to a proposed course of medical treatment, also provides a freestanding claim for the violation of the "right to self determination."  Neither *Cornfeldt* nor any other source of Minnesota law does any such thing.  As a federal court sitting in diversity, this Court should reject the Saliers' attempt to extend liability beyond anything recognized by the state's legislature or lower courts, let alone by the Minnesota Supreme Court.

*Second*, the Saliers' intentional infliction of emotional distress ("IIED") claims fail to plausibly allege multiple critical elements.  An IIED claim requires, among other things, that the defendant engaged in conduct "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community."  *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 439 (Minn. 1983).  The Walmart pharmacist's conduct here—which comported with professional norms, guidance issued by the Minnesota Board of Pharmacy, and the actions of Hy-Vee's independent yet similarly situated pharmacist—cannot possibly meet this standard.  Nor do the Saliers' allegations plausibly plead the element of severe mental distress.  Minnesota courts routinely reject IIED claims that allege even

---

[1] Each of the three causes of action encompasses a pair of claims, as the Saliers each have asserted a claim against Walmart under each of the three causes of action.

significant physical manifestations of emotional distress.  The Saliers, by contrast, have alleged none.

*Third*, the Saliers' claims that Walmart tortiously interfered with their contracts with the Missouri doctor also fall short in multiple ways.  At the outset, this tort prevents third parties from actively inducing a party to a contract to breach it, or at most from actively frustrating its performance.  But as both common sense and the Restatement dictate, it cannot stretch to a third party's mere refusal to facilitate the contracting parties' agreement.  The common law does not permit two parties to use a contract to impose duties on a stranger to the contract.  Yet the Saliers allege nothing more than a passive refusal to assist.  Moreover, even if the Walmart pharmacist's mere refusal to fill prescriptions could be deemed a sufficient interference with a contract, the Saliers' complaint itself demonstrates that it was not "without justification," as the tort requires.  Because the pharmacist's refusal to fill the prescriptions rested on his independent professional judgment, as Minnesota law permits, his conduct was justified.

*Finally*, even aside from these incurable defects, the Saliers have failed to comply with Minnesota's requirement that plaintiffs submit an affidavit of expert review in support of any claims—whether or not denominated as malpractice—that challenge a pharmacist's or other medical professional's exercise of professional judgment.  Unless the Saliers remedy this failure within sixty days, Minnesota law imposes mandatory dismissal of their claims with prejudice for this reason as well.

## FACTUAL BACKGROUND

Plaintiff William Salier contracted COVID-19 in October 2021.  (Am. Compl. ¶¶ 8, 20.)  He initially sought monoclonal antibody and ivermectin treatment at an Iowa clinic.  (*Id.* ¶ 12.)  The clinic determined that he did not meet the criteria for the limited supply of monoclonal antibodies available, and the attending physician "declined to prescribe" ivermectin.  (*Id.* ¶ 12.)  After a telehealth appointment, Mollie James, a Missouri doctor, prescribed ivermectin.  (*Id.* ¶¶ 14, 16.)

Dr. James sent the prescription to a Walmart pharmacy in Albert Lea, Minnesota.  When Karla Salier attempted to fill it, the pharmacist on duty declined to do so because ivermectin "was not appropriate to treat COVID-19 patients."  (*Id.* ¶ 17.)  Karla Salier asked again, and the pharmacist again explained his judgment (or, as the Amended Complaint puts it, "lecture[d] her") about "how Ivermectin was dangerous for her husband despite his doctor's prescription."  (*Id.* ¶ 18.)  Karla Salier also had contracted COVID-19, and the pharmacist declined to fill Dr. James's prescriptions for ivermectin and hydroxychloroquine for her "for the same reasons at the same time."  (*Id.* ¶ 20.)  When Dr. James called the pharmacist, the pharmacist "continued to refuse to fill the prescription and attempted to lecture Dr. James about how she was imperiling the Saliers' health."  (*Id.* ¶ 19.)

The Saliers then went to Hy-Vee, which likewise refused to fill the ivermectin and hydroxychloroquine prescriptions.  (*Id.* ¶ 21.)  Ultimately, the Saliers took a veterinary formulation of ivermectin.  (*Id.*  ¶¶ 22-23.)  They experienced a "rapid and significant improvement in their condition," with no "negative health problems."  (*Id.* ¶¶ 24-27.)

Each of the Saliers now sue Walmart for (1) violating a purported "common law right to self determination" (Counts 1 and 2); (2) IIED (Counts 3 and 4); and (3) tortious interference with contractual relations (Counts 5 and 6).  (*Id.* ¶¶ 40-73 (capitalization altered).)  The claims of William and Karla Salier are materially identical to each other. They each also bring similar claims against Hy-Vee.  (*See id.* ¶¶ 74-105.)

## LEGAL STANDARD

"To survive a motion to dismiss, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 795 (8th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "This standard 'asks for more than a sheer possibility that a defendant has acted unlawfully.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 678).  Although "a plaintiff need not set forth detailed factual allegations, or specific facts that describe the evidence to be presented, the complaint must include sufficient factual allegations to provide the grounds on which the claim rests."  *Id.* at 795-96 (internal quotation marks omitted).  Accordingly, "[t]he court is not bound to accept as true a legal conclusion couched as a factual allegation," to "divine the litigant's intent and create claims that are not clearly raised," or to "conjure up unpled allegations to save a complaint."  *Id.* at 796 (internal quotation marks omitted).

Because the Saliers' claims in this diversity case arise under Minnesota law, Minnesota substantive law and federal procedural rules apply.  *Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).  Although applying state law can require predicting how the state high court would decide an unsettled issue, "[i]t is not the role of a federal

court to expand state law in ways not foreshadowed by state precedent." *Id.* at 665, 673; *see also Kingman v. Dillard's, Inc.*, 643 F.3d 607, 615 (8th Cir. 2011) (federal courts' "role in diversity cases is to interpret state law, not to fashion it"). Federal courts thus properly "decline to extend the reach of [state] laws . . . as a matter of first impression." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 519 (8th Cir. 2018) (citing *Ashley Cnty.*, 552 F.3d at 673).

## ARGUMENT

## I. Minnesota Law Does Not Recognize Claims For Violation Of The Purported "Common Law Right To Self Determination" (Counts 1 and 2).

The Saliers' first pair of claims purports to rest on a tort that does not exist under Minnesota law—a violation of the putative "common law right to self-determination." (Am. Compl. ¶¶ 40-49.) These claims rest on dicta plucked out of context from the Minnesota Supreme Court's decision in *Cornfeldt v. Tongen* that "every adult of sound mind [has the right] to determine what shall be done with his own body." *See* 262 N.W.2d at 701. The quoted language, however, came in the course of the Court's "recogni[tion of] a cause of action for negligent nondisclosure of risks attendant to proposed or alternative methods of treatment." *Id.* at 699. Subsequent state and federal Minnesota cases resting on *Cornfeldt* have understood it to mean exactly what it says—that Minnesota recognizes the tort of negligent nondisclosure. *E.g.*, *Kohoutek v. Hafner*, 383 N.W.2d 295, 298-99 (Minn. 1986); *Haile v. Sutherland*, 598 N.W.2d 424, 428-30 (Minn. Ct. App. 1999); *Mills v. Qualey*, No. 10-cv-3068, 2012 WL 13027996, at *5 (D. Minn. Oct. 16, 2012). This tort "'does not involve negligence in the administration of treatment, in failure to treat, or in failure to properly diagnose.'" *Kingsley v. Pinto*, No. A10-1197, 2011 WL 1743840, at *2

(Minn. Ct. App. May 9, 2011) (quoting *Madsen v. Park Nicollet Med. Ctr.*, 431 N.W.2d 855, 861 (Minn. 1988)).

At the absolute most, the Saliers have alleged a failure to treat—precisely an allegation that the negligent-nondisclosure tort does not cover. *See id*. Far from failing to disclose information about risks, Walmart's pharmacist did the opposite—he disclosed and explained to the Saliers and their doctor his professional judgment that "Ivermectin was dangerous for [William Salier] despite his doctor's prescription" and that the prescriptions in question "imperil[ed] the Saliers' health," and accordingly declined to fill the prescriptions. (Am. Compl. ¶¶ 18-19.) Although the Saliers assert that the pharmacist's decision lacked a "reasonable medical or scientific basis," and claim without elaboration that it rested on "baseless political conclusions," their own allegations demonstrate that in fact the pharmacist's decision rested on his own fully disclosed professional judgments regarding the risks of the proposed treatment.

Even if Minnesota case law did not affirmatively foreclose the Saliers' theory of liability (which it does), these claims would still lack merit. As noted above, federal courts exercise caution when confronting a request to extend Minnesota law beyond anything the Minnesota Legislature or Minnesota Supreme Court has recognized. *Ashley Cnty.*, 552 F.3d at 665. Indeed, even when "two competing yet sensible interpretations of state law exist, [federal courts] should opt for the interpretation that restricts liability, rather than expands it, until the Supreme Court of [the relevant state] decides differently." *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 253 & n.10 (3d Cir. 2010) (internal quotation marks omitted) (collecting cases including *Ashely County*). Accordingly, even if this were

merely a "matter of first impression," *Park Irmat Drug Corp.*, 911 F.3d at 519, or an open question—rather than one already settled adversely to the Saliers—their claims would fail.

Finally, although nothing in *Cornfeldt* or any other Minnesota case suggests the existence of an independent "self-determination" cause of action extending beyond a negligent nondisclosure claim, even if it did, any such cause of action could not possibly extend as far as the Saliers seek to stretch it here. They assert not only the right "to determine what shall be done with [their] own bod[ies]," *see Cornfeldt*, 262 N.W.2d at 701, but also the right to force third-parties to facilitate their choices. Even the broadest reading of Minnesota law cannot support that position.

## II.   The Saliers Fail To Plausibly Allege Multiple Elements Of Their IIED Claims (Counts 3 and 4).

The Saliers' second pair of claims—for intentional infliction of emotional distress—also falls short in multiple ways. The elements of a Minnesota IIED claim are "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." *Hubbard*, 330 N.W.2d at 438-39. "The extreme nature of conduct necessary to invoke the tort and the necessary severity of consequent mental distress emphasizes the limited nature of the action and the strong policy to prevent fictitious and speculative claims." *Bohdan v. Alltool Mfg., Co.*, 411 N.W.2d 902, 908 (Minn. Ct. App. 1987). The Saliers have failed to plausibly allege either of these core elements.

### A.   The Saliers Fail To Plausibly Allege Extreme And Outrageous Conduct.

Conduct is "extreme and outrageous" for IIED purposes only if it is "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized

community." *Hubbard*, 330 N.W.2d at 439.  This standard requires far more than mere unreasonableness, as "civilized societies tolerate a lot of unreasonable conduct." *Edison v. Nat'l R.R. Passenger Corp.*, No. 20-cv-614, 2021 WL 2515516, at *10 (D. Minn. June 18, 2021) (brackets and internal quotation marks omitted).  For example, filing a knowingly false police report about one's employer—while certainly egregious—"does not rise to the level of outrage that is 'utterly intolerable to the civilized community.'" *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 866 (Minn. 2003) (quoting *Hubbard*, 330 N.W.2d at 439); *see also Strauss v. Thorne*, 490 N.W.2d 908, 913 (Minn. Ct. App. 1992) (potentially defamatory allegations of child abuse, made with malice and causing a family to be denied insurance not "extreme and outrageous" for IIED purposes).  At the pleading stage, too, courts routinely dismiss IIED claims that involve even obviously unreasonable conduct that nonetheless falls short of the tort's stringent standards.  Examples include:

- School officials engaged in an "arguably . . . callous, intrusive, and insensitive abuse of power" including forcing a 12 year old student to surrender passwords to her Facebook and email accounts and then searching through them in front of her for sexual conversations she had had with a male classmate (not at school or during school hours), even though the district employees' alleged conduct violated the First and Fourth Amendments sufficiently clearly to overcome qualified immunity.  *R.S. ex rel. S.S. v. Minnewaska Area Sch. Dist. No. 2149*, 894 F. Supp. 2d 1128, 1134-35, 1141, 1143-44, 1146 (D. Minn. 2012).  "As troubling as [these] allegations may be, . . . they do not meet the requirements for an IIED claim" because "a

reasonable fact-finder could not find that the alleged behavior of the school defendants was utterly intolerable to the civilized community." *Id.* at 1146.

- An employer "threatened to discharge [plaintiff] if he did not resign, made false accusations about his job performance, evicted him from employer-provided housing, claimed that he engaged in sexually-inappropriate behavior with female staff and acted in a generally improper fashion during the termination investigation." *Elkharwily v. Mayo Holding Co.*, 955 F. Supp. 2d 988, 999 (D. Minn. 2013). "Even if true, . . . such allegations do not rise to the level of extreme or outrageous conduct." *Id.*

- A school district failed to correct a "hurtful" situation in which its hockey coach "singl[ed] . . . out" a student-athlete who had criticized her "for ridicule and punishment" by refusing to talk to her, "telling her teammates not to talk to her, embarrassing and verbally attacking her in front of others, excluding her from team functions, and benching her during games." *Albert v. Indep. Sch. Dist. No. 709*, No. A12-1516, 2013 WL 1500986, at *1, *4 (Minn. Ct. App. Apr. 15, 2013). Although "such conduct by a high school coach may be characterized as childish and unprofessional, it cannot be said that it exceeds the boundaries of decency or is utterly intolerable to the civilized community." *Id.* at *4.

None of the Saliers' allegations come anywhere close to meeting this element's high bar. To begin, as the Saliers themselves acknowledge, other providers—the Iowa clinic and Hy-Vee—likewise declined to prescribe or dispense ivermectin or hydroxychloroquine.

(*See* Am. Compl. ¶¶ 12, 21.)   The fact that other medical professionals acting independently took similar action suggests that Walmart's conduct was not wrongful at all, and at the very least belies any claim that it was "so atrocious that it passe[d] the boundaries of decency and [was] utterly intolerable to the civilized community."  *See Hubbard*, 330 N.W.2d at 439; *cf. Sarkisian v. Rooke*, No. 06-cv-170, 2007 WL 9811040, at *6 (E.D. Pa. Mar. 23, 2007) ("typical business behavior" that was not "extreme deviance from the norms of professional conduct[] or from the social norms of a community" not "extreme and outrageous" under Pennsylvania law).

Indeed, in exercising his professional judgment, the Walmart pharmacist acted well within the scope of governing law and guidance set out by the Minnesota Board of Pharmacy.  In an FAQ published on its website, the Board's answer to the question "Can a pharmacist refuse to fill a prescription for Ivermectin to treat or prevent COVID-19?" begins: "It is the legal responsibility of the pharmacist to determine the legal validity of a prescription and ensure the prescription is clinically appropriate for the patient.  A pharmacist may refuse to fill or refill a prescription if, in the pharmacist's professional judgement, there is a question as to the drug's safety and/or efficacy."  *See* Minnesota Board of Pharmacy, Frequently Asked Questions: Complaints ("Pharmacy Board FAQs") (last visited Apr. 5, 2022).[2]  By the Saliers' own allegations, that is precisely what

_____

[2] Available at https://mn.gov/boards/pharmacy/public/frequentlyaskedquestions.jsp. Earlier guidance was to the same effect.  *See, e.g.*, Minnesota Board of Pharmacy, Frequently Asked Questions: COVID-19, at 29 (Oct. 29, 2020), available at https://mn.gov/boards/assets/FAQ%20COVID%2019_tcm21-453789.pdf (response to question "How can pharmacists respond to requests to fill prescriptions for drugs such as . . . hydroxychloroquine . . . when it appears that the intended use is to treat COVID-19" begins: "Pharmacists are required to fill prescriptions that pharmacists are reasonably

Walmart's pharmacist did here.  He explained to Karla Salier and Dr. James his conclusion that ivermectin was not clinically "appropriate" to treat COVID-19.  (*See* Am. Compl. ¶¶ 17-20.)  That professional judgment, moreover, tracks Pharmacy Board guidance.  *See* Pharmacy Board FAQs.  Conduct in line with professional norms and guidance is not wrongful, let alone so "extreme and outrageous" that it is "utterly intolerable to the civilized community."  *See K.A.C. v. Benson*, 527 N.W.2d 553, 560 (Minn. 1995) (no IIED liability where doctor acted in accord with his licensing board's guidance).

Nor, finally, can the Saliers rest successful IIED claims on the idea that the pharmacist's explanation of his conclusion was "rude," "paternalist," or "lectur[ing]."  (Am. Compl. ¶¶ 54, 62.)  As a matter of law, "'insults'" or "'indignities'" do not give rise to IIED claims.  *Langeslag*, 664 N.W.2d at 865 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).  Thus, even accepting the Saliers' characterization of the pharmacist's explanation as a rude lecture, they still have failed to allege facts that, if proved, state a claim upon which relief can be granted.

## B.   The Saliers Fail To Plausibly Allege Severe Emotional Distress.

The Saliers' IIED claims also fail for a second, independent reason.  Even when a plaintiff adequately alleges extreme and outrageous conduct, "[a] complainant must sustain a similarly heavy burden of production in his allegations regarding the severity of his

---

expected to fill.  However, a pharmacist can refuse to fill a prescription if, in the pharmacist's professional judgment, the prescription is not legally valid or clinically appropriate.").  The court may properly take judicial notice of these official government documents on official government websites.  *See Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (citing *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011)).

mental distress." *Hubbard*, 330 N.W.2d at 439; *see Stead-Bowers v. Langley*, 636 N.W.2d 334, 343 (Minn. Ct. App. 2001) (assuming extreme and outrageous conduct element met, IIED claim still failed because plaintiff did not plausibly allege "that the conduct caused her to suffer severe emotional distress"). Even significant manifestations of distress can be insufficient. For example, the Minnesota Supreme Court has held that depression, "stomach disorders" including "throwing up," a "skin rash," and "high blood pressure" fell short where the defendant "never missed work, never filed a claim for workers' compensation, and never saw a doctor" for those problems. *Hubbard*, 330 N.W.2d at 440. Likewise insufficient are allegations of "reoccurring headaches, night sweats, insomnia, illness and physical pain." *Besett v. Wadena Cnty.*, No. 10-cv-934, 2010 WL 5439720, at *17 (D. Minn. Dec. 7, 2010) (R&R), *adopted in full*, 2010 WL 5441937 (D. Minn. Dec. 28, 2010); *see also, e.g.*, *Thomas v. UnitedHealth Grp., Inc.*, No. 12-cv-47, 2014 WL 5307579, at *16 (D. Minn. Oct. 16, 2014) (numbness, nervousness, anxiousness, and a tight and burning chest that "did not prevent [plaintiff] from working or caring for her family" insufficient); *Elstrom v. Indep. Sch. Dist. No. 270*, 533 N.W.2d 51, 57 (Minn. Ct. App. 1995) ("insomnia, crying spells, [plaintiff's] fear of answering her door and telephone, and depression, which caused her to seek treatment" insufficient). Indeed, as this Court recently explained, claims that a plaintiff "feared for his life" and "now suffers from sleepless nights" also fall short. *Edison*, 2021 WL 2515516, at *11.

Measured against these standards, the Saliers' cursory allegations of the severity of their emotional distress fail to state a claim. They primarily assert that they were both afraid for their health and William Salier's life. (Am. Compl. ¶¶ 55, 63.) But this Court

has already held such claims insufficient.  *Edison*, 2021 WL 2515516, at \*11.  Indeed, according to the Saliers' own allegations, they quickly secured veterinary ivermectin, took it, and speedily recovered from COVID-19 with no ill effects.  (Am. Compl. ¶¶ 22-27.) There is not even a conclusory allegation that any emotional distress interfered with the Saliers' lives or daily activities.  Nor is there even the degree of physical manifestation of emotional distress such as headaches or stomach problems that courts have routinely found insufficient.  For this reason as well, the Court should dismiss the Saliers' IIED claims.

### III.   The Saliers Fail To Plausibly Allege Multiple Elements Of Their Tortious Interference With Contractual Relations Claims (Counts 5 and 6).

The Saliers' third pair of claims—for tortious interference with contractual relations—likewise falls short.  "A cause of action for wrongful interference with a contractual relationship requires: (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages."  *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994) (internal quotation marks omitted).  In explaining the bounds of this tort, the Minnesota Supreme Court routinely cites and relies on the Restatement (Second) of Torts. *See, e.g.*, *Sysdyne Corp. v. Rousslang*, 860 N.W.2d 347, 351-52 (Minn. 2015); *Kjesbo*, 517 N.W.2d at 588; *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 505 (Minn. 1991); *Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 27 (Minn. 1982).  Here, the Saliers have failed to allege facts sufficient to support the elements of intentional procurement of a breach and the absence of justification.

A.      **The Saliers Fail To Plausibly Allege That Walmart Intentionally Procured Any Breach Of Contract.**

The alleged contract on which the Saliers' claims rest is "between Dr. Mollie James and [the Saliers] for Dr. James to provide medical treatment to the best of her knowledge, skills, ability, and experience to [them]." (Am. Compl. ¶¶ 65, 70.) The Saliers suggest that Walmart induced a breach by "denying Dr. James the ability to prescribe a legal medicine for [them]," because they had "expectations . . . that Dr. James could lawfully prescribe [them] medications from pharmacies that [they] could not obtain otherwise." (*Id.* ¶¶ 65, 67, 70, 72.) But nothing Walmart or its pharmacist did prevented Dr. James from prescribing anything. Even if there were a contract between the Saliers and Dr. James that required Dr. James to prescribe a medication, that contract would not cover the dispensing of said medication by an unaffiliated entity like Walmart. Just as Dr. James would not be in breach if she prescribed monoclonal antibodies but the Saliers were unable to obtain them due to shortages, (*cf. id.* ¶¶ 11-12 (noting such shortages),) or if the Saliers simply failed to fill the prescriptions, Dr. James did not breach any contract to "provide medical treatment" simply because the Saliers were unable to obtain the ivermectin or hydroxychloroquine she prescribed. To the contrary, the allegations in the complaint demonstrate that any contract between the Saliers and Dr. James was performed: Dr. James issued the prescriptions in question, and she continued to treat the Saliers after Walmart and Hy-Vee both refused to fill them. (*See id.* ¶ 23 (referring to "the guidance that Dr. James gave" the Saliers in "calculating the appropriate dosage" of veterinary ivermectin).)

15

The Saliers' failure to allege a breach forecloses their tortious interference claim. "Under Minnesota law, . . . the plaintiff must prove that the defendant *caused* the breaching party to breach its contract." *Qwest Commc'ns Co. v. Free Conferencing Corp.*, 905 F.3d 1068, 1074 (8th Cir. 2018); *see also Bebo v. Delander*, 632 N.W.2d 732, 738-39 (Minn. Ct. App. 2001) ("A district court does not err by concluding a tortious-interference-with-contract claim fails when the plaintiff has not shown breach of contract."); *Sterling Cap. Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 127 (Minn. Ct. App. 1998) ("Because no breach occurred here, Sterling's claim for tortious interference with contract must fail."); *ARP Wave, LLC v. Salpeter*, No. 18-cv-2046, 2021 WL 168501, at *18 (D. Minn. Jan. 19, 2021) ("ARPwave cannot show a breach of any contract, and thus cannot recover for wrongful interference with a contract.").

To be sure, courts occasionally have allowed Minnesota tortious interference claims to proceed even absent an "explicit breach of contract" where the defendant commits an "*act* injuring or destroying persons or property which retards, makes more difficult, or prevents performance, or makes performance of a contract of less value to the promisee." *Cent. Specialties, Inc. v. Large*, 18 F.4th 989, 998 (8th Cir. 2021) (emphasis added) (internal quotation marks omitted). But that still requires that the defendant have done something beyond merely refusing to facilitate the contract. As the Restatement makes clear, a tortious interference claim "does not apply to a mere refusal to deal" because "one may ordinarily refuse to deal with another, and the conduct is not regarded as improper, subjecting the actor to liability." Restatement (Second) of Torts § 766 cmt. b (1979). This

necessary limitation prevents contracting parties from compelling the actions of third-parties who are strangers to the agreement.

### B. The Saliers Fail To Plausibly Allege That Walmart's Actions Lacked Justification.

Even if the Saliers had adequately alleged the intentional procurement of a breach (which they have not), their claims would still fail because, as a matter of law, Walmart's actions were not "without justification." "'The test [for this element] is what is reasonable conduct under the circumstances.'" *Sysdyne Corp.*, 860 N.W.2d at 351 (brackets omitted) (quoting *Kjesbo*, 517 N.W.2d at 588). Although "justification as a defense to interference with a contract is ordinarily a question of fact, . . . cases may arise in which a court may determine that, as a matter of law, a defendant had justification for its alleged interference." *Cent. Specialties*, 18 F.4th at 999; *see Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 982-84 (8th Cir. 2008) (affirming pleading stage dismissal of tortious interference claim on justification grounds); *Select Comfort Corp. v. Sleep Better Store, LLC*, 838 F. Supp. 2d 889, 893-97 (D. Minn. 2012) (dismissing tortious interference claim at the pleading stage on justification grounds). This is just such a case.

"'Generally, a defendant's actions are justified if it pursues its legal rights via legal means.'" *Select Comfort Corp.*, 838 F. Supp. 2d at 893 (quoting *Noble Sys. Corp.*, 543 F.3d at 983); *see Howard v. Minn. Timberwolves Basketball Ltd. P'ship*, 636 N.W.2d 551, 559 (Minn. Ct. App. 2001) (team's assertion of "its right to exclude" photographer from its games did not tortiously interfere with his contract with trading card companies). And as described above, a pharmacist acts properly in declining to dispense a prescription that, in his or her professional judgment, is not "clinically appropriate for the patient" where

"there is a question as to the drug's safety and/or efficacy."  Pharmacy Board FAQs.  Nor would the pharmacist's awareness that declining to fill the prescription might have some impact on a contract between Dr. James and the Saliers make that choice unjustified. "Mere knowledge that a decision might affect other parties' contracts is not the same as intentional, unjustified interference."  *Spice Corp. v. Foresight Mktg. Partners, Inc.*, No. 07-cv-4767, 2011 WL 6740333, at *19 (D. Minn. Dec. 22, 2011).

In short, the Saliers' own allegations demonstrate that the Walmart pharmacist's conduct was based on his professional judgment and thus was not "without justification." Their tortious interference claims should be dismissed on this ground as well.  *Cf. Church Ekklasia Sozo, Inc. v. CVS Health Corp.*, No. 20-cv-382, 2021 WL 4429459, at *11-12 (W.D.N.C. Sept. 27, 2021) (dismissing tortious interference claim under North Carolina law because, among other reasons, "pharmacists' exercise of their professional judgment" was a "legitimate exercise of [their] rights").

## IV. The Saliers' Failure To Provide The Affidavit Of Expert Review Required By Minn. Stat. § 145.682 Also Requires Dismissal Unless Cured Within 60 Days.

In addition to the many flaws in their Amended Complaint noted above, the Saliers did not serve an affidavit of expert review "with the summons and complaint" as Minnesota law requires.  Like many states, Minnesota imposes heightened requirements on plaintiffs bringing medical malpractice or similar claims.  As relevant here, in such cases, the plaintiff must serve an affidavit by plaintiff's counsel "with the summons and complaint" stating that "the facts of the case have been reviewed by the plaintiff's attorney with an expert whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial and that, in the opinion of this expert, one or more defendants

18

deviated from the applicable standard of care and by that action caused injury to the plaintiff." Minn. Stat. § 145.682, subd. 2, 3(1). The failure to provide this affidavit "within 60 days after demand . . . results, upon motion, in mandatory dismissal with prejudice of each cause of action as to which expert testimony is necessary to establish a prima facie case." *Id.*, subd. 6(a)(1). A motion to dismiss qualifies as the necessary demand where, as here, it "'provide[s] adequate notice that an affidavit of expert review is required.'" *Judah v. Ovsak*, 550 F. Supp. 3d 687, 707 (D. Minn. 2021) (quoting *Brown-Wilbert, Inc. v. Copeland Buhl & Co.*, 732 N.W.2d 209, 215 (Minn. 2007)).[3]

Minnesota law requires this affidavit of expert review in any suit that alleges "malpractice, error, mistake, or failure to cure, whether based on contract or tort, against a health care provider which includes a cause of action as to which expert testimony is necessary to establish a prima facie case." Minn. Stat. § 145.682, subd. 1. The definition of "health care provider" includes "all persons or entities providing health care as defined in section 145.61, subdivisions 2 and 4," *id.*, which in turn expressly includes "a person licensed or registered . . . to practice as a pharmacist," Minn. Stat. § 145.61, subd. 2. Although the Saliers have not denominated any of their causes of action as "malpractice," state and federal courts in Minnesota consistently recognize the requirements' applicability to claims that turn on "'conduct that is connected to a person's professional licensure.'"

---

[3] As this Court has noted, "[o]ther judges in this district have found—and this Court agrees—that the affidavit-of-expert-review requirement of § 145.682 is a substantive, not a procedural, requirement," and thus applies fully in diversity cases like this one. *Vogel v. Turner*, No. 11-cv-446, 2012 WL 5381788, at *3 (D. Minn. Nov. 1, 2012) (Schiltz, J.) (collecting cases).

*C.C. v. Fairview Health Servs.*, No. A09-2320, 2010 WL 3000603, at *2 (Minn. Ct. App. Aug. 3, 2010) (quoting *Paulos v. Johnson*, 597 N.W.2d 316, 320 (Minn. Ct. App. 1999)); *see also Gorokhova v. Kirshbaum*, No. A05-2549, 2006 WL 3490799, at *2 (Minn. Ct. App. Dec. 5, 2006) (requirement applies to claims including fraudulently recording information on a patient's chart).

Other jurisdictions likewise refuse to allow plaintiffs to "use artful pleading to avoid [similar state-law] requirements when the essence of the suit is a health care liability claim," i.e., a claim where "the act or omission alleged in the complaint is an inseparable part of the rendition of health care services." *Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 543-44 (Tex. 2004); *see also e.g.*, *Littlepaige v. United States*, 528 F. App'x 289, 293-94 (4th Cir. 2013) (despite plaintiff's argument that her claim was only for ordinary negligence, the claim actually sounded in malpractice, and was thus subject to dismissal for failing to comply with the requirements for a malpractice action under North Carolina law); *State ex rel. Red Cross Pharmacy, Inc. v. Harman*, 423 S.W.3d 258, 266-67 (Mo. Ct. App. 2013) (similar Missouri statute applied to plaintiff's claims "however characterized by [her]" because they "challenge[d] the adequacy of the Pharmacy's performance of some of its central health-care functions").

The Saliers' claims all fail to state a claim upon which relief may be granted, for the reasons explained above. Even assuming the Saliers have stated valid claims, however, the claims all trigger the Minnesota affidavit requirement, because they seek to impose liability related to health care services:

1.   A negligent nondisclosure claim under *Cornfeldt* requires an expert review affidavit.  *Haile*, 598 N.W.2d at 427-28 (dismissing negligent nondisclosure claim for failure to properly submit required affidavit of expert review); *Paulos v. Johnson*, 502 N.W.2d 397, 400 (Minn. Ct. App. 1993) (same).

2.   IIED claims that "arise[] out of the provision of medical services" trigger Minnesota's affidavit requirement.  *Phillips v. Fairview Health Servs.*, No. 10-cv-4442, 2011 WL 6151514, at *2-3 (D. Minn. Dec. 12, 2011).  This rule makes good sense—when "the alleged mistreatment by [defendants] relates to their professional duties in providing medical services to [the] plaintiff," conduct that complies with the standard of care can scarcely be deemed "extreme and outrageous."  *See id.* at *3 (to demonstrate "intentional infliction of emotional distress," Plaintiff must show that the defendant's conduct "did not comply with the applicable standard of care").

3.   So too with respect to the Saliers' tortious interference claims.  Because one of the elements of this cause of action is that Walmart acted "without justification," their prima facie case requires establishing that the Walmart pharmacist's actions were professionally unreasonable.  An affidavit of expert review is thus required for these claims as well.

## CONCLUSION

For the reasons set forth above, and based on the entire record in this matter, Walmart respectfully requests that the Court dismiss all claims against it with prejudice.

Dated: April 5, 2022

**JONES DAY**

By: /s/ *Kristin K. Zinsmaster*
    KRISTIN K. ZINSMASTER (#0391299)
    MATTHEW. J. RUBENSTEIN (#0400744)
    JONES DAY
    90 South 7th Street, Suite 4950
    Minneapolis, MN 55402
    (612) 217-8800
    kzinsmaster@jonesday.com
    mrubenstein@jonesday.com

*Attorneys for Defendant Walmart Inc.*