## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

WILLIAM SALIER, KARLA        :
SALIER,                      :
                             :
    Plaintiffs,          :    Dkt. No.: 0:22-cv-00082
v.                           :
                             :
WALMART, INC.; HY-VEE, INC.,  :
                             :
    Defendants.          :    APRIL 27, 2022

## <u>MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTIONS TO DISMISS</u>

The Plaintiffs, William and Karla Salier, respectfully submit this memorandum of law in response to Defendant Walmart, Inc's motion to dismiss (Dkt. 20) and Defendant HY-VEE, Inc.'s motion to dismiss (Dkt. 17).[1]

## **FACTUAL BACKGROUND**

## I.    **The Saliers' Ordeal.**

On October 1, 2021, William Salier began to experience symptoms of illness that caused him to obtain a COVID-19 test. Dkt. 9, ¶ 8. That test revealed that he had contracted COVID-19. *Id*. at ¶ 8. Thus, Salier quarantined himself for what he, as a former Marine and proud farmer, assumed would be a quick recovery. *Id*. at ¶ 9.

COVID-19, however, had different ideas. Within days, Salier lost all sense of taste or smell, began to experience severe shortness of breath, and found himself

---

[1] Since both Defendants raise similar, if not identical, legal arguments, the Saliers address both in a single memorandum of law, which they believe facilitates judicial economy.

bed-ridden. *Id*. at ¶ 10. His condition steadily worsened until he and his wife, Karla, began to seek treatment. *Id*. at ¶ 11.

The Saliers first sought monoclonal antibody treatments through the Minnesota Resource Allocation Platform, but their efforts went unanswered. *Id*. at ¶ 11. Determined to get her husband the help he needed, Karla Salier transported him to a clinic in Osage, Iowa to see if they would treat him with antibodies or Ivermectin. *Id.* at 12. The clinic informed them that William was not sick enough to merit treatment with monoclonal antibodies, and the attending physician declined to prescribe Ivermectin. *Id*. at ¶ 12.

After the Saliers returned home, William's situation deteriorated to the point where, even as a Marine Corps veteran and a hardy farmer, he began to fear for his life. *Id*. at ¶ 13. The Saliers then obtained a telehealth appointment with Dr. Mollie James – a Missouri doctor who has successfully treated countless COVID-19 patients. *Id*. at ¶ 14.

Dr. James realized that the Saliers' fears about William's condition were well-founded and that he was on the verge of requiring intensive care unit treatment, which would leave him with less than a 50% chance of survival. *Id*. at ¶ 15. His only alternative to avoid this danger was to receive effective treatment immediately. *Id*. at ¶ 15. Dr. James prescribed several treatments for William, and she sent it to the Walmart pharmacy in Albert Lea, Minnesota. *Id*. at ¶ 16.

Instead of filling William's prescription, Walmart's pharmacist called Karla Salier to inform her that Walmart refused to fill Dr. James' prescription of Ivermectin, stating that it was not appropriate to treat COVID-19 patients with it. *Id.* at ¶ 17. When Karla informed him of her husband's condition and begged him to fill the prescription according to their doctor's orders, Walmart's pharmacist did not respond politely and lectured her about how Ivermectin was dangerous for her husband despite his doctor's prescription. *Id.* at ¶ 18. He also refused to fill the prescription again. *Id.* at ¶ 18.

Karla Salier then informed Dr. James who contacted the Walmart pharmacist and explained William Salier's critical condition and the safety of Ivermectin. *Id.* at ¶ 19. Instead of engaging in a professional discussion, the pharmacist refused to fill the prescription and attempted to lecture Dr. James about how she was imperiling the Saliers' health before hanging up on her. *Id.* at ¶ 19.

At this time, Karla Salier also fell sick with COVID-19, and Dr. James prescribed her ivermectin and hydroxychloroquine – prescriptions which the same Walmart refused to fill at the same time that it refused to fill William Salier's prescriptions. *Id.* at ¶ 20.

Undaunted and desperate to save their lives, the Saliers turned to a Hy-Vee supermarket in Albert Lea, Minnesota to fill their prescriptions. *Id.* at ¶ 21. Hy-Vee's pharmacist told them that it was "its corporate policy to refuse Ivermectin and hydroxychloroquine prescriptions to treat COVID-19." *Id.* at ¶ 21. Hy-Vee's

pharmacist filled every other prescription that Dr. James issued to the Saliers. *Id*. at ¶ 21.

At this point, William Salier faced a choice between life or death, and he turned to his farming knowledge and his Marine Corps training to do what Marines are trained to do in life-or-death situations. *Id*. at ¶ 22. He improvised a solution to follow Dr. James' orders. *Id*. at ¶ 22. He and Karla purchased the veterinary version of Ivermectin – a tube of horse paste with Ivermectin as its only active ingredient. *Id*. at ¶ 22.

The Saliers then calculated the appropriate dosage of horse paste, mixed it into dishes of apple sauce, and consumed it in multiple doses. *Id*. at ¶ 23. Within 24 hours of a regular course of Ivermectin horse paste, both William and Karla Salier noticed a rapid and significant improvement in their conditions. *Id*. at ¶ 24. After a week of consistent horse paste consumption, both Saliers had recovered sufficiently to resume their normal activities with some moderate limitations, and they resumed their normal lives after two weeks. *Id*. at ¶¶ 25-26. Neither experienced any negative health problems from Dr. James' prescriptions. *Id*. at ¶ 27.

## II.     The Reality Of "Off-Label" Prescriptions In American Medicine.

According to the FDA, prescriptions for "off-label" use occur when a doctor prescribes an FDA-approved drug for an unapproved use. *Id*. at ¶ 28. Federal law does not prohibit prescriptions for "off-label" uses, and the U.S. Federal Drug

Administration (FDA) leaves decisions about off-label prescriptions to a physician's best medical judgment. *Id*. at ¶¶ 29-31.

A February 23, 2021 Congressional Research Service Report estimates that, as of 2006, approximately 21% of prescriptions issued in the United States are for "off-label" uses. *Id*. at ¶ 32. "Off-label" uses are not just for novel ailments, and they are used to treat relatively mundane ailments – for instance, epilepsy medicine being used to treat menopausal hot flashes and bipolar disorder. *Id*. at ¶ 33.

## III.   Ivermectin – A Safe, Nobel Prize Winning, Essential Drug.

Ivermectin has received global recognition as a safe and essential drug. The FDA fully approved Ivermectin as a safe drug in 1996, and the World Health Organization now includes it on its List of Essential Medicines. *Id*. at ¶ 35. Additionally, its discoverers won the 2015 Nobel Prize for Physiology or Medicine for discovering its source drug, Avermectin. *Id*. at ¶ 36.

Ivermectin also boasts an unparalleled safety record. Out of more than 4 billion doses administered worldwide, only 28 cases of serious adverse reactions to it have been reported. *Id*. at ¶ 37. In other words, a person has only a 0.0000007% of having a serious adverse reaction to a dosage of Ivermectin.

Studies have also shown that Ivermectin is effective at inhibiting at least 21 viruses, including COVID-19. *Id*. at ¶ 38. Studies have also indicated that Ivermectin is overwhelmingly effective against COVID-19, showing that it reduces the active viral load of COVID-19 in cell by 99.8% in 24 hours and 99.98% in 48 hours. *Id*. at ¶

39. In other words, Ivermectin has proven to be an effective treatment for COVID-19 despite its lack of recognition by the CDC or the National Institute of Health.

## PROCEDURAL HISTORY

The Saliers filed this action on January 13, 2022. Dkt. 2. On January 20, 2022, the Court ordered the Plaintiffs to file an amended complaint curing deficiencies in their diversity jurisdiction allegations. Dkt. 7. They timely complied on February 3, 2022. Dkt. 9.

Defendant Hy-Vee appeared on February 14, 2022 and filed its motion to dismiss on April 5, 2022. Dkt. 10-11, 17. Defendant Walmart appeared on February 16, 2022, and filed its motion to dismiss on April 5, 2022. Dkt. 14-15, 20.

## LEGAL STANDARD

In reviewing a motion to dismiss for a failure to state a claim under Fed. R. Civ. P. 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008). While a complaint's factual allegations do not need to be detailed, they must "raise a right to relief above the speculative level...." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint must "state a claim to relief that is plausible on its face." *Id*. at 570.

I.    **The Court should deny the Defendants' motions to dismiss the Saliers' self-determination claims.**

The Defendants seek the dismissal of the Saliers' self-determination claims (Counts One, Two, Seven, and Eight) on the grounds that Minnesota law does not

recognize a cause of action for a failure to treat. Dkt. 19, pp. 9-17; Dkt. 24, pp. 6-8. They err.

The question turns on the nature of "the principle of self-determination" that the Minnesota Supreme Court recognized in *Cornfeldt v. Tongen*, 262 N.W.2d 684, 701-02 (Minn. 1977). The Minnesota Supreme Court described this principle as having "a corollary of which is the right of every adult of sound mind to determine what shall be done with his own body." *Id*.

The Defendants submit that both the context of *Cornfeldt* and subsequent Minnesota precedent has limited it to merely recognizing a claim for negligent non-disclosure. They, however, read *Cornfeldt* and subsequent precedent far too narrowly.

*Cornfeldt* did specifically recognize a tort of negligent non-disclosure, but no Minnesota appellate court has dealt with its broader statement that "every adult of sound mind" has a right "to determine what shall be done with his own body." *Id*. Thus, the Minnesota Supreme Court's statement in *Madsen v. Park Nicollet Medical Center*, 431 N.W.2d 855, 861 (Minn. 1988) that the tort of negligent non-disclosure does not involve "negligence in the administration of treatment, in failure to treat, or in failure to properly diagnose" does not limit the broader statement that it delivered in *Cornfeldt*. In other words, *Cornfeldt* creates a question of Minnesota law that remains open and unresolved.

The Court should not slam the door on the Saliers' claim simply because Minnesota law does not supply a specific answer to whether it is plausible or not. Instead, it should certify the question to the Minnesota Supreme Court for resolution.

Defendant Hy-Vee, but not Defendant Walmart, raises the additional argument that Minnesota law permits pharmacists to decline to fill prescriptions. Dkt. 19, pp. 13-15. Its reading of Minnesota law, however, is far too broad.

Under Minn. Stat. § 151.06, subd. 1(a)(11)(b), a pharmacist is required to exercise professional judgment to "perform the prospective drug utilization review" required by state regulations. Minn. R. § 6800.3110 subp. 4 establishes the scope of "the prospective drug utilization review" and limits it to seven factors: "overutilization or underutilization," "therapeutic duplication," "drug-disease contraindications," "drug-drug interactions," "incorrect drug dosage or duration of drug treatment," "drug-allergy interactions," or "clinical abuse or misuse." If the pharmacist concludes that there is a problem, the law requires, if necessary, a consultation with the prescriber. *Id*.

In this regard, the facts alleged by the Saliers become particularly important. Hy-Vee did not permit its pharmacist to exercise any professional judgment. Instead, it promulgated and enforced a corporate policy to refuse all Ivermectin and hydroxychloroquine prescriptions to treat COVID-19. Dkt. 9, ¶ 21. While it now asks the Court to decline to don a white coat, its executives abandoned their suits and

donned white coats to overrule their pharmacists' professional judgment for the purposes of pandering to political fearmongering. *Id.* at ¶¶ 78, 83. Thus, Hy-Vee's pharmacist failed to conduct any prosecutive drug utilization review at all, rendering hollow its claim that it followed Minnesota law.

Both Walmart and Hy-Vee share a common problem. Ivermectin enjoys an incredible safety profile that is breathtaking. Out of more than 4 billion doses worldwide, only 28 cases of serious adverse reactions have been reported. Dkt. 9, ¶ 37. 28 cases. In other words, no question exists that Ivermectin is incredibly safe to use even if its efficacy in treating COVID-19 is in dispute. *C.f.* Dkt. 9, ¶ 39. Thus, both Walmart and Hy-Vee declined to fill the Saliers' ivermectin prescriptions because they doubted its effectiveness.

The implications of such a state of the law are scary to say the least. Pharmacists control access to drugs. They have a ministerial responsibility to fill prescriptions that runs concurrent to a professional responsibility to guard against abuses that could harm patients' health. Allowing them to overrule physicians based on nothing more than a disagreement as to the efficacy of an off-label prescription would give them life and death power over critically ill patients without ever examining them.

Both Walmart and Hy-Vee abused that power in this case. What multiplies the terrifying effect of their abuse of their power is that, despite Walmart's baseless claim of patient safety, the main opposition to Ivermectin prescription to treat

9

COVID-19 prior to the Saliers needing it arose from Joe Rogan's public advocacy for it.[2] Mr. Rogan's prominent status as a podcast host and his hosting of "conspiracy theorists" such as Alex Jones drew intense political backlash against his claim that it had assisted him in combatting COVID-19. Suddenly, Ivermectin – safer than Tylenol to that point – had been labelled horse paste and blackballed as a poison pill by the media and government officials alike for no other reason than Mr. Rogan's comments that it had helped him. The Saliers alleged that political rather than professional medical conclusions motivated the Defendants' refusal to fill their Ivermectin prescriptions. Dkt. 9, ¶¶ 44, 49, 78, 83.

The very nature of the power to deny life-saving drugs – improperly exercised for political reasons – undercuts the Saliers' right to control their own bodies. Undeniably, that power properly exercised serves an important role in safeguarding patients from unsafe drug usage, but it improperly supersedes the Saliers' right to preserve their own bodies from a deadly disease when it is exercised for non-medical reasons as it was in their case.

Receiving proper medical treatment belongs in the hands of informed patients and reasonable doctors who have assessed their patients' individual conditions and assisted them in making informed decisions, not pharmacists acting based on corporate and political motivations. Minnesota law provides sufficient basis for the Court to reach this common-sense conclusion, and it should either deny

---

[2] https://www.npr.org/2021/09/01/1033485152/joe-rogan-covid-ivermectin

the Defendants' motions to dismiss Counts One, Two, Seven, and Eight or it should refer the question to the Minnesota Supreme Court.

## II. The Court should deny the Defendants' motions to dismiss the Saliers' tortious interference claims.

Both Defendants move to dismiss the Saliers' claims that they tortiously interfered with their contractual relations with Dr. Mollie James on the same grounds. First, they claim that the Saliers failed to plausibly allge that they intentionally procured the breach of any contract. Second, they claim that the Saliers failed to plead that any procurement of a breach was without legal justification. These arguments falter.

To prove tortious interference with contractual relations, the Saliers must establish: "(1) there is a contract; (2) the defendant[s] knew about the contract; (3) the defendant[s] intentionally procured a breach of the contract without justification; and (4) the [Saliers] suffered injuries as a direct result of the breach." *Karnewie-Tuah v. Frazier*, 757 N.W.2d 714, 719 (Minn. Ct. App. 2008).

### A. The Defendants intentionally prohibited Dr. James from treating the Saliers.

At the outset, Minnesota law does not require an explicit breach of contract to support a claim for tortious interference with contractual relations. Instead, Minnesota law provides "a right of action" to parties "against person who are by their conduct substantially interfering with the performance thereof." *Johnson v. Gustafson*, 277 N.W. 252, 254 (Minn. 1938). While Minnesota courts have often

conceptualized this principle as involving acts that injured people or destroyed property, *see Central Specialties, Inc. v. Large*, 18 F.4th 989, 998-99 (8th Cir. 2021) (compiling cases), *Johnson* establishes a far broaded principle of "substantial interference." In other words, plaintiffs are not required to allege property or personal physical damage to proceed under a tortious interference claim.

There is no question that the Saliers have met this standard against both Walmart and Hy-Vee. They entered into a contract with Dr. Mollie James for her to provide them with life-saving treatment against advanced COVID-19 infection according to the best of her knowledge, skills, ability, and experience. Dkt 9, ¶¶ 65, 70, 97, 102. Their reasonable expectation from that contract was that Dr. James would be able to prescribe them medicine that they could not obtain otherwise. *Id.* at ¶¶ 65, 70, 97, 102. Both Walmart and Hy-Vee knew, or should have known, of this contract and its reasonable expectations by the prescription that Dr. James sent both of them to fill. *Id.* at ¶¶ 66, 71, 98, 103.

The Saliers further alleged that both Walmart and Hy-Vee did not merely refuse to participate in the furtherance of a transaction, but rather injected political biases into a patient-physician relationship with the intention of frustrating the Saliers' contract with Dr. James. *Id.* at ¶¶ 53, 60, 67, 72, 78, 83. They then effectuated their intention by declining to fill the Saliers' prescriptions. These allegations plainly state that both Walmart and Hy-Vee substantially interfered with the Saliers' contract with Dr. James for improper purposes. Thus, the Saliers more than surpass

the pleading standard under Minnesota law, and the Court should reject both Defendants' argument that they did not intentionally interfere with the Saliers' contract with Dr. James.

### B. The Defendants bear a factual burden to prove a legal justification for their actions, which is not appropriately determined at the motion to dismiss stage.

At the outset, the Court should reject both Defendants' arguments that the Saliers did not proactively plead that the Defendants lacked a legal justification. As a matter of Minnesota substantive law, "[w]hether the interference is justified is normally a question of fact," and the burden to prove justification lies with the Defendants. *Sysdyne Corp. v. Rousslang*, 860 N.W.2d 347, 351 (Minn. 2015). This test requires the fact-finder to determine "what is reasonable conduct under the circumstances." *Id.* at 351 (internal quotations and citations omitted). Thus, the Defendants' arguments would impose a heightened pleading standard on the Saliers that would require them to effectively disprove the Defendants' justification defense prior to hearing it. Such a rule is not comtemplated by federal pleading standards, and it would unfairly require the Saliers to speculate as to the Defendants' legal conclusions.

In any event, the Saliers have pled enough facts to meet even a heightened pleading standard. Both Walmart and Hy-Vee claim that Minnesota law gives their pharmacists the right to decline to fill a prescription based on their professional judgment. While the Saliers concede that Minnesota law does empower pharmacists

with that discretion, they have also pled that neither Walmart nor Hy-Vee's denials of their prescriptions was based on the exercise of professional judgment, but rather political biases.

With respect to Walmart, the Saliers alleged that, while the Walmart pharmacist paid lip service to the Saliers' health and safety, he substituted his political judgments for Dr. James' reasoned medical judgments as to what was best for the Saliers. Dkt. 9, ¶¶ 53, 60. Reinforcing this factual allegation is Walmart's pharmacist's failure to consult with Dr. James regarding her prescription even though such a consultation is required by Minnesota law. Minn. R. § 6800.3110 subp. 4. Despite knowing how critically ill William Salier was, the Walmart pharmacist failed to consult with Dr. James, which required her to ultimately attempt to intercede on behalf of her patients. Dkt. 9, ¶ 19. He then rebuffed her attempt by attempting to lecture her before hanging up the phone on her. Dkt. 9, ¶ 19. In other words, something other than a reasonable exercise of professional judgment was motivating his treatment of the Saliers and Dr. James. The Saliers alleged that it was his political conclusions. Walmart contests the allegation. The question is properly reserved for a jury or summary judgment.

Hy-Vee enjoys no better fortune. The Saliers alleged that it failed to permit its pharmacist to exercise any professional judgments at all. Instead, it promulgated and enforced a corporate policy to refuse all Ivermectin and hydroxychloroquine prescriptions to treat COVID-19. Dkt. 9, ¶ 21. A policy promulgated by untrained

14

corporate executives reeks of political motivations, which do not even approach the exercise of professional judgment required by Minn. R. § 6800.3110 subp. 4. The Saliers brought these allegations. Hy-Vee contests them. The question as to the motivation or justification for its actions is properly reserved for a jury or summary judgment.

### III. The Court should deny the Defendants' motions to dismiss the Saliers' intentional infliction of emotional distress claims.

Under Minnesota law, intentional infliction of emotional distress consists of four distinct elements: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional and reckless; (3) it must cause emotional distress; and (4) the distress must be severe." *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003) (internal quotations and citations omitted).

Neither Walmart nor Hy-Vee claim that the Saliers have failed to properly allege the second and third elements. Dkt. 19, pp. 17-25; Dkt. 24, pp. 8-14. It is a well-established rule that federal courts do not "entertain arguments made by a party for the first time in a reply brief." *Micek v. Mayo Clinic*, 2021 WL 5282755 at 2 n.2 (D.Minn. 2021) (internal quotations and citations omitted). For purposes of their motions to dismiss, the Defendants' failures to contest these elements constitute concessions that the Saliers have alleged that the Defendants acted intentionally and recklessly in endangering the Saliers' health and lives. As discussed below in the individual subsections, these concessions should bear tremendous weight in the Court's consideration of the first and fourth elements.

15

To satisfy the first element, plaintiffs must allege conduct "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Langeslag*, 664 N.W.2d at 865 (internal quotations and citations omitted). In other words, "the conduct must lead an average member of the community to exclaim 'Outrageous!'" *Id*. Thus, "insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not rise to the level of "extreme and outrageous" conduct. *Id*. The purpose of this strict standard is to "prevent fictitious and speculative claims." *Id*. at 866.

The fourth element requires the plaintiffs to allege that the distress "inflicted is so severe that no reasonable man could be expected to endure it." *Id.* at 869.

### A.  Counts Three And Four – The Saliers' Claims Against Walmart.

The discussion of the Saliers' claims against Walmart must start with the conceded conduct that the Saliers properly alleged and that Walmart conceded was intentional and reckless.

Walmart's pharmacist called Karla Salier to inform her that Walmart refused to fill Dr. James' prescription of Ivermectin for William Salier and her on the grounds that it was not appropriate to treat COVID-19 patients with it. Dkt. 9, ¶ 17. Karla Salier informed him that William was critically ill, and his survival was at stake if he did not receive the treatment prescribed by Dr. James. *Id*. at ¶¶ 17, 53, 60. Instead of conferring with Dr. James as required by Minn. R. § 6800.3110 subp. 4 or filling the prescription, Walmart's pharmacist lectured her about how Ivermectin was

16

supposedly dangerous for her husband and denied the Saliers life-saving medicine for a second time. *Id*. at ¶¶ 18, 54, 62. When Dr. James attempted to initiate the discussion required by Minn. R. § 6800.3110 subp. 4, the Walmart pharmacist ignored her explanation of the safety of Ivermectin and her warning that William Salier was critically ill. *Id*. at ¶¶ 19, 53, 60. Instead, he attempted to lecture her on how she was imperiling the Saliers' health and then hung up on her. *Id*. at ¶ 19.

The Walmart pharmacist engaged in this conduct despite being informed of the safety of Ivermectin and being made aware that William Salier's life was at stake. *Id*. at ¶¶ 17, 19, 53, 60. While the pharmacist paid lip service to the Saliers' health and safety, the Saliers allege that he substituted his political judgments for Dr. James' reasoned medical judgments as to what was best for Salier. *Id*. at ¶¶ 53, 60.

The result of Walmart's conduct was that William and Karla Salier feared that William would lose his life due to COVID-19 as the result of Walmart intentionally and recklessly denying them appropriate treatment prescribed by their doctor. *Id*. at ¶¶ 55, 63. They endured significant agony as they desperately sought to obtain the treatment elsewhere. *Id*. at ¶¶ 55, 63. Their emotional distress ultimately became so severe as they faced William's impending death that they resorted to desperate measures to save their health and William's life. They purchased and consumed horse paste to save their lives instead of being allowed to take FDA-approved compositions of Ivermectin even though it would have constituted an "off-label" usage. *Id*. at ¶¶ 22-25.

These facts lead to two clear conclusions. First, despite knowing that William Salier's life was in danger, Walmart denied life-saving treatment to him based on political conclusions rather than sound medical judgment. It did so despite knowing that Ivermectin had an unparalleled safety record. Not content with such politically motivated folly, Walmart's pharmacist then functionally taunted Karla Salier and, by extension, William Salier with a lecture about how they were going to endanger their own health when it knew that William Salier was at serious risk of dying from COVID-19 and that withholding Ivermectin would deny him the chance at life that his doctor believed that it would give him.

Words do not do nearly enough justice to encapsulate how outrageous Walmart's conduct was. It denied life-saving treatment to a man in danger of dying on the basis of political conclusions and taunted his desperate wife about it in the process. Its conduct was the equivalent of yanking a straw away from a drowning man and taunting him as he goes underwater for the final time. A jury will have no difficulty saying "outrageous!" The Court should not either.

Second, the Saliers' emotional distress was so severe that a Marine Corps veteran feared for his life, and he and his wife took desperate measures to save it. The measures that they were forced to resort to were the precise measures that talking heads and government officials had castigated Joe Rogan for when he spoke about the benefits of Ivermectin. Instead of being able to take the medication prescribed by their doctor, the Saliers' emotional distress and despair was so severe

that they consumed horse paste to save their lives – the very course of action that government officials had repeatedly warned the public not to take and one that only the gravest necessity drove the Saliers to take.

If the Saliers' emotional distress and corresponding actions do not meet the threshold of severe emotional distress, no form of emotional distress will be severe enough to satisfy Minnesota law. No reasonable person could have endured the stress that Walmart subjected the Saliers to after they exhausted every option to save their lives. A jury will have no difficult reaching this conclusion, and the Court should not reach a contrary one. Thus, it should decline to dismiss Counts Three and Four of the Saliers' Complaint.

## B.  Counts Nine And Ten – The Saliers' Claims Against Hy-Vee.

Like Walmart, the discussion of the Saliers' claims against Hy-Vee must start with the conceded conduct that the Saliers properly alleged and that Hy-Vee conceded was intentional and reckless.

Unlike Walmart, Hy-Vee did not even pay lip-service to a supposed concern for the Saliers' safety. Instead, its corporate executives stripped its pharmacist of all professional discretion by establishing a baseless corporate policy to refuse Ivermectin and hydroxychloroquine prescriptions to treat COVID-19. *Id*. at ¶ 21. Despite Karla Salier informing Hy-Vee of William's critical illness, it persisted in its corporate policy of declining to fill William Salier's prescription for Ivermectin. *Id*. at ¶¶ 87, 93.

The result of Hy-Vee's conduct was that William and Karla Salier feared that William would lose his life due to COVID-19 as the result of Hy-Vee intentionally and recklessly denying them appropriate treatment prescribed by their doctor on the basis of decisions made by people who were not even medical professionals. *Id.* at ¶¶ 21, 87, 93. They endured significant agony as they desperately sought to obtain the treatment elsewhere. *Id.* at ¶¶ 88, 95. Their emotional distress ultimately became so severe as they faced William's impending death that they resorted to desperate measures to save their health and William's life. They purchased and consumed horse paste to save their lives instead of being allowed to take FDA-approved compositions of Ivermectin even though it would have constituted an "off-label" usage. *Id.* at ¶¶ 22-25.

These facts also yield two clear conclusions. First, Hy-Vee knew that William Salier's life was in danger and that his doctor had prescribed him Ivermectin and hydroxychloroquine to avert that danger. Nonetheless, it permitted a corporate policy with no basis in professional or medical judgment to entirely supersede the independent judgment of its pharmacist and deny the Saliers life-saving treatment. In other words, Hy-Vee's corporate executives exercised medical judgment, which they had no knowledge or training to exercise. The result was that they jeopardized the Saliers' lives.

Words do not do nearly enough justice to encapsulate how outrageous Hy-Vee's conduct was. It denied life-saving treatment to a man in danger of dying on the

20

basis of its corporate executives' uninformed and untrained judgments. In other words, the suits replaced the white coats, and an upstanding veteran almost lost his life because of it. Its actions were the equivalent of a person refusing to rescue others from a sinking ship because they did not like the color of the life rafts. A jury will have no difficulty calling this corporate arrogance "outrageous!" The Court should not either.

Second, as discussed above, no reasonable person could have endured the stress that Hy-Vee subjected the Saliers to after they exhausted every option to save their lives. They resorted to desperate and potentially hazardous measures to save their lives in their emotional distress. That alone stands as proof of the severity of their emotional distress, and the Court should decline to dismiss Counts Nine and Ten.

### C. In the alternative, Fed. R. Civ. P. 12(b)(6) does not provide the Defendants with an end-run around the Seventh Amendment.

There is no question that Minnesota has established incredibly high hurdles for plaintiffs to overcome if they wish to prevail on an intentional infliction of emotional distress claim. As discussed above, the Saliers plausibly allege facts that enable them to survive the Defendants' motions to dismiss. Should the Court be inclined to conclude otherwise, the Saliers submit that the elements of an intentional infliction of distress claim under Minnesota require inevitable determinations of fact that the Seventh Amendment reserves for a jury's determination.

No right was more sacred to the Founders than the right to jury trials. *See Parsons v. Bedford*, 28 U.S. 433, 446 (1830) ("The trial by jury is justly dear to the American people. It has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealously"). Thus, the Seventh Amendment guarantees a right to a jury trial for suits at the common law or, in other words, damages actions.

The Supreme Court has held that the textual purpose of the Seventh Amendment was not "to preserve mere matters of form and procedure, but substance of right." *Slocum v. New York Life Ins. Co.*, 228 U.S. 364, 378 (1913) (internal quotations and citations omitted). Thus, the common law substance of the right to a civil jury trial is the substance that existed under "English common law when the Amendment was adopted." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 376 (1996) (internal quotation marks and citations omitted). That common law substance requires that "questions of fact in commonlaw actions shall be settled by a jury, and that the court shall not assume, directly or indirectly, to take from the jury or to itself such prerogative." *Slocum*, 228 U.S. at 378.

As discussed previously, Minnesota law establishes four elements that plaintiffs must allege facts to support in order to proceed on claims of intentional infliction of emotional distress. The two elements contested here – "extreme and outrageous conduct" and "severe emotional distress" intertwine determinations of law and fact to such a degree as to require a jury to decide them.

First, under Minnesota law, the "extreme and outrageous conduct" element requires a determination of whether the conduct at issue would lead the average member of the community to exclaim "Outrageous!" *Langeslag*, 664 N.W.2d at 865. With the utmost respect to the Court, the Saliers submit that the Court is not "the average member of the community" referred to in Minnesota law. Its judicial and legal experiences have undoubtedly hardened it somewhat to the conduct that the rest of society would consider egregious.  "The average member of the community" is the type of person that the Court would summon from the Minnesota community who could serve on a jury as a representative of "the average member of the community." Only a Minnesota citizen could properly determine whether the Saliers have alleged facts that would cause an "average member of the community" exclaim "Outrageous!" Thus, the very substantive nature of the "extreme and outrageous conduct" element requires a jury's determination of whether it has been met.

Second, under Minnesota law, the "severe emotional distress" element requires a determination of whether the emotional distress "inflicted is so severe that no reasonable man could be expected to endure it." *Id.* at 869. While the Saliers harbor no doubts as to the fact that the Court is eminently reasonable, this standard also contemplates a determination by a reasonable member of the community, not one hardened by his vocation to be less sensitive to emotional stress than the average community member. Once again, the Court's judicial and legal experiences have undoubtedly inured it somewhat to stress that an ordinarily reasonable

member of the community would find intolerable. Thus, the only fact-finder who can properly determine if the standard has been met is a jury.

The Saliers recognize that Minnesota courts have engaged in analyses akin to "sufficiency of the evidence" analyses. *See, e.g., Langeslag*, 664 N.W.2d 860 (addressing false police reports, legal threats, and workplace arguments and rejecting an intentional infliction of emotional distress claim). Minnesota courts' ability to conduct these analyses, however, stems from Minnesota procedural law, not Minnesota substantive law.

The applicable federal procedural law in this instance is constitutional. While Fed. R. Civ. P. 12(b)(6) and Supreme Court precedent permit the Court to conduct a "plausibility" analysis on a motion to dismiss, the Seventh Amendment prohibits the application of the "plausibility" analysis from usurping the jury's role as a fact finder. *Slocum*, 228 U.S. at 378. The Seventh Amendment's limitation of the "plausibility" analysis rests on the *standards* of Minnesota substantive law, not "sufficiency of the evidence" conclusions made pursuant to *Minnesota procedural law* which allows the usurpations of a jury's role.[3]

Minnesota substantive law's standards inform the "plausibility" analysis for the purpose of precluding "fictitious and speculative claims." *Langeslag*, 664 N.W.2d

---

[3] While the Minnesota Supreme Court has held that its state constitution protects "essentially the same jury trial rights as those provided under the federal constitution," it has not self-incorporated the Seventh Amendment against itself, and it has not applied its state constitutional provisions to limit "sufficiency of the evidence" usurpations of jury trials and verdicts.

at 866. The Defendants' failures to contest whether their conduct was "intentional and reckless" and that their conduct caused the Saliers emotional distress immediately remove the Saliers' claims from the realm of "fictitious and speculative claims." Thus, the two remaining questions before the Court both simplify to a single question: "How bad?"

Since the answer to "How Bad?" specifically depends on the perspective of the average member of the community under Minnesota law, the Seventh Amendment prohibits the Court from deciding the question under the "plausibility" standard unless the Defendants' conceded conduct falls within the specific categories of frivolous claims delineated in Minnesota law: "insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.*

As discussed in the preceding sections, the Saliers are not claiming mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. They are claiming the denial of life-saving medical treatment for a disease that has caused a significant number of deaths across the United States and the world. They claim that the motivations for that denial were political in Walmart's case and uninformed and political in Hy-Vee's case. Walmart's denial of a safe, life-saving medication to a critically ill man in danger of death for political reasons and its taunt of his desperate wife in the process constitutes the ultimate, non-frivolous claim of "extreme and outrageous" conduct that will plausibly make a juror exclaim "outrageous!" Hy-Vee's denial of the same treatment to the same critically ill man in

25

danger of death based on the uninformed opinions of corporate executives instead of its pharmacist's judgment constitutes a non-frivolous claim that will plausibly cause a juror to exclaim "outrageous!"

Finally, the evidence of the desperate measures that the Saliers were forced to take because of the Defendants' actions will plausibly cause a jury to wonder if they would have taken the same desperate measures that the Saliers did due to the severity of the distress they incurred.

Thus, the Court should invoke the Seventh Amendment's requirements in its consideration of Minnesota substantive law, and it should deny the Defendants' motions to dismiss the Plaintiffs' intentional infliction of emotional distress claims.

## IV. The Undersigned Acknowledge The Defendants' Demands Under Minn. Stat. § 145.61 And Will Seek Permission To File An Amended Complaint To Bring The Saliers' Complaint Into Compliance.

The undersigned acknowledge, and take sole responsibility for, the Saliers' failure to supply an affidavit of counsel pursuant to Minn. Stat. § 145.61 with their claims. Without conceding that they are pure malpractice claims to the extent that such an assertion is contradicted herein, the undersigned acknowledge the Defendants' demands dated April 5, 2022 for an affidavit of counsel certifying an expert's review and conclusion that the Defendants deviated from the applicable standard of care and by that action caused injury to the Saliers. They will secure such an affidavit and will seek permission to amend the Saliers' complaint within 60 days of April 5, 2022 for the sole purpose of remedying the defect.

## **CONCLUSION**

For the foregoing reasons, the Saliers ask the Court to deny the Defendants'

motions to dismiss in their entirety.

THE PLAINTIFFS

/s/ Marjorie J. Holsten /s/

MAJORIE J. Holsten, ESQ.
Bar #: 185899
Holsten Law office
8525 Edinbrook Crossing,
Ste. 210
Brooklyn Park, MN 55443
Tel: 763-420-7034
marjholsten@yahoo.com

/s/ Cameron L. Atkinson /s/

CAMERON L. ATKINSON, ESQ.
*Pro hac vice (442289CT)*
PATTIS & SMITH, LLC
383 Orange Street
New Haven, CT 06511
Tel:  (203) 393-3017
Fax: (203) 393-9745
catkinson@pattisandsmith.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on April 27, 2022, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

<u>/s/ Cameron L. Atkinson /s/</u>