UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

WILLIAM SALIER and KARLA SALIER,        Case No. 22-CV-0082 (PJS/ECW)

            Plaintiffs,

v.                                                           ORDER

WALMART, INC., and HY-VEE, INC.,

            Defendants.

---

Cameron L. Atkinson, PATTIS & SMITH, LLC; Marjorie J. Holsten, HOLSTEN LAW OFFICE, for plaintiffs.

Kristin K. Zinsmaster and Matthew J. Rubenstein, JONES DAY, for defendant Walmart, Inc.

Andrew B. Brantingham, Stephen P. Lucke, and Donna Reuter, DORSEY & WHITNEY LLP, for defendant Hy-Vee, Inc.

Plaintiffs William and Karla Salier brought this action against defendants Walmart, Inc. ("Walmart"), and Hy-Vee, Inc. ("Hy-Vee"). The Saliers have asserted various tort claims related to Walmart's and Hy-Vee's refusals to fill the Saliers' prescriptions for ivermectin and hydroxychloroquine, two drugs that the Saliers wanted to use to treat their COVID-19 infections, even though virtually every medical and governmental authority to address the issue has said that ivermectin and hydroxychloroquine should not be used to treat COVID-19.

This matter is before the Court on defendants' motions to dismiss. For the reasons that follow, the motions are granted.

## I. BACKGROUND

William became severely ill with COVID-19 in October 2021.  ECF No. 9 ¶¶ 8, 10.

Unable to obtain monoclonal antibody treatments either in Minnesota (where the Saliers

live) or in Iowa, the Saliers sought to treat William's infection with ivermectin.  *Id.*

¶¶ 11–12, 4–5.  After "significant persistence," the Saliers obtained a telehealth

appointment with a controversial Missouri physician named Mollie James, who

describes herself as "an activist for medical freedom, patients [sic] right to choose, and

physicians [sic] right to practice medicine unencumbered."  The James Clinic, *Let*

*Doctors Be Doctors*, https://jamesclinic.com/about (last visited Aug. 19, 2022).  Dr. James

prescribed ivermectin for William and sent that prescription to a Walmart pharmacy in

Minnesota.  *Id.* ¶¶ 15–16.  The Walmart pharmacist declined to fill the prescription,

however, "stating that it was not appropriate to treat COVID-19 patients with

[ivermectin]."  *Id.* ¶ 17.  Neither Karla nor Dr. James was able to convince the

pharmacist to reconsider.  *Id.* ¶¶ 18–19.

Eventually, Karla also contracted COVID-19, and Dr. James prescribed not only

ivermectin but also hydroxychloroquine for her.  *Id.* ¶ 20.  The Walmart pharmacy again

refused to fill the prescriptions, so the Saliers tried to get the prescriptions filled at a Hy-

Vee pharmacy.  *Id.* ¶¶ 20–21.  The Hy-Vee pharmacy also declined, citing its "corporate

policy to refuse Ivermectin and hydroxychloroquine prescriptions to treat COVID-19."

*Id.* ¶ 21.  Ultimately, the Saliers resorted to using veterinary ivermectin—"horse paste," as they call it, *id.* ¶ 22—after which the Saliers say they experienced "rapid and significant improvement."  *Id.* ¶¶ 22–26.

The Saliers brought this action against Walmart and Hy-Vee, seeking to recover damages under three theories:

*First*, the Saliers allege that defendants violated what the Saliers characterize as their "common law right to self-determination."  *Id.* ¶ 41.  According to the Saliers, a "corollary of this right" is "the common law right of 'every adult of sound mind to determine what shall be done with his own body.'"  *Id.* (quoting *Cornfeldt v. Tongen*, 262 N.W.2d 684, 701 (Minn. 1977)).  The Saliers allege that defendants' refusals to fill their prescriptions violated this right because defendants "had no reasonable medical or scientific basis for declining" to fill the prescriptions, "endangered" the Saliers' lives, "forced [the Saliers] to improvise a home remedy intended for horses," and "chose to replace [Dr. James's] reasoned judgment and [the Saliers'] own reasoned decisionmaking" with "baseless political conclusions" (in Walmart's case) and "a one-size-fits-all corporate policy based on political fearmongering" (in Hy-Vee's case).  *Id.* ¶¶ 40–49, 74–83.

*Second*, the Saliers allege that defendants intentionally inflicted emotional distress.  Specifically, the Saliers allege that defendants committed extreme and

outrageous conduct by substituting their "political judgments" (Walmart) and

"corporate policy" (Hy-Vee) "for Dr. James' reasoned and qualified judgment at the risk

of" the Saliers' life and health. *Id.* ¶¶ 53, 60–61, 87, 93–94. The Saliers further allege that

the Walmart pharmacist's "paternalist and rude lecture to Karla Salier about how she

was endangering William Salier's health despite her efforts to inform [Walmart] of how

ill William Salier was" constituted extreme and outrageous conduct. *Id.* ¶¶ 62, 54.

*Finally*, the Saliers allege that defendants tortiously interfered with contract by

impeding Dr. James's performance of her obligation to "provide [the Saliers] medical

treatment to the best of her knowledge, skills, ability, and experience." *Id.* ¶¶ 65, 70, 97,

102. The Saliers allege that defendants "intentionally procured the breach of that

contract without justification by substituting" their "political and fear-driven

conclusions" (Walmart) and "corporate policy" (Hy-Vee) "in place of Dr. James'

knowledge, skills, ability, and experience" and by "denying Dr. James the ability to

prescribe a legal medicine." *Id.* ¶¶ 67, 72, 99, 104. As a result, the Saliers "lost the

informed aid of Dr. James' assistance to obtain life-saving medicine" and "were forced

to devise a home remedy that could have endangered [their] health." *Id.* ¶¶ 68, 73, 100,

105.

Defendants have moved to dismiss the Saliers' claims under Fed. R. Civ.

P. 12(b)(6). Defendants have also moved to dismiss the Saliers' claims under Minn. Stat.

§ 145.682, arguing that the Saliers failed to provide the expert-review affidavit required by that statute.

## II.  FAILURE TO STATE A CLAIM

### A.  Legal Standards

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all of the factual allegations in the complaint, *Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008), and draw all reasonable inferences in the plaintiff's favor, *Kelly v. City of Omaha*, 813 F.3d 1070, 1075 (8th Cir. 2016), while disregarding legal conclusions couched as factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The complaint's factual allegations need not be detailed, but they "must be enough to raise a right to relief above the speculative level," and the complaint must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

"[F]ederal courts sitting in diversity apply state substantive law and federal procedural law."  *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996).  The parties agree that Minnesota substantive law applies to the Saliers' claims.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  In interpreting Minnesota law, this Court is bound by decisions of the Minnesota Supreme Court.  *Hope v. Klabal*, 457 F.3d 784, 790 (8th Cir. 2006).  If the Minnesota Supreme Court has not ruled on an issue of state law,

then this Court must "ascertain from all the available data what the state law is," *Soto v. Shealey*, 331 F. Supp. 3d 879, 885 (D. Minn. 2018) (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940)), and "apply what [the Court] find[s] to be the state law after giving 'proper regard' to relevant rulings of other courts of the [s]tate," *id.* (last alteration in original) (quoting *Comm'r v. Est. of Bosch*, 387 U.S. 456, 465 (1967)).

### B.  Right to Self-Determination

The Saliers first claim that Walmart and Hy-Vee violated what they characterize as their "common law right to self-determination."  ECF No. 9 ¶ 41.  At oral argument, the Saliers' attorney struggled mightily—and unsuccessfully—to define the contours of this "right."  That is not surprising, given this right does not exist in Minnesota or anywhere else.

The Saliers' claim that Minnesota recognizes a right to self-determination is based on a single sentence of dicta that appears in a medical-malpractice case decided by the Minnesota Supreme Court almost 45 years ago:

> Our society is morally and legally committed to the principle of self-determination, a corollary of which is the right of every adult of sound mind to determine what shall be done with his own body.

*Cornfeldt*, 262 N.W.2d at 701–02 (citing *Schloendorff v. Soc'y of N.Y. Hosp.*, 105 N.E. 92, 93 (N.Y. 1914)).  But the Minnesota Supreme Court made that statement in the context of *informed consent*—a doctrine ensuring that a patient's decisions about her health care are

*informed*.  Absolutely nothing in *Cornfeldt* or any other case suggests that, under

Minnesota law, a health-care provider has a legal obligation to provide any and all

treatments or medications demanded by a patient.

The implications of recognizing the right asserted by the Saliers—not just the

right to do whatever you want with your own body, but the right to *force others to help*

*you* (so much for *their* right of self-determination)—would be mind-boggling, even if it

were just limited to medical providers.  If a pharmacist at Walmart is legally required to

fill a prescription for ivermectin because the patient demands it, then is every doctor in

Minnesota legally required to provide an abortion if a patient demands it?  Is every

nurse legally required to assist a patient in committing suicide?  Is every pharmacist

legally required to provide medical marijuana?  When pressed with such questions at

oral argument, the Saliers' attorney prevaricated.

It is one thing to say that a patient has the right to refuse medical treatment.  It is

quite another thing to say that a patient has the right to force a medical provider to

provide a particular type of medical treatment against his or her professional judgment.

As far as the Court knows, not a single state has recognized such a right.[1]  To the

---

[1]At oral argument, the Saliers' counsel identified *Stamford Hospital v. Vega*, 674 A.2d 821 (Conn. 1996), as holding that "a private hospital had to provide certain treatment" to a patient.  ECF No. 35 at 13.  That is not what *Vega* held.  In *Vega*, a hospital sought an injunction to authorize it to provide a blood transfusion to save the life of a patient who had declined the procedure because of her religious beliefs.

(continued...)

contrary, several state courts have ruled that patients do *not* have a legal right—whether

constitutional, statutory, regulatory, or common-law—to compel health-care providers

"to administer a treatment they do not wish to provide." *Pisano v. Mayo Clinic Fla.*,

333 So.3d 782, 789 (Fla. Dist. Ct. App. 2022); *see also, e.g.*, *DeMarco v. Christiana Care*

*Health Servs.*, 263 A.3d 423, 434–37 (Del. Ch. 2021) (holding "healthcare providers have

no duty to administer ivermectin to a COVID-19 patient"); *Tex. Health Huguley, Inc. v.*

*Jones*, 637 S.W.3d 202, 215–16 (Tex. App. 2021) (holding COVID-19 patient not entitled

to injunction requiring hospital to administer ivermectin); *Abbinanti v. Presence Cent. &*

*Suburban Hosps. Network*, 2021 IL App (2d) 210763 ¶ 20 (same).

  In short, the Saliers ask this Court to recognize a sweeping new right—one that

has never been recognized by any state—that would have profound implications for a

wide range of controversial issues (such as abortion and assisted suicide) and that

would completely upend the legal regulation of doctors, dentists, physician assistants,

nurses, pharmacists, and other health-care professionals.  The Saliers base their request

on a fragment of sloppy dicta in an opinion that analyzed a different issue—dicta that,

as best as the Court can determine, has not been cited a single time by either the

---

[1](...continued)
674 A.2d at 824–26.  The Connecticut Supreme Court held that the injunction violated
the patient's right to *decline* treatment.  *Id.* at 831–32.  *Vega* created no obligation on
health-care providers to *provide* treatment.

Minnesota Supreme Court or the Minnesota Court of Appeals since it was published

45 years ago.

The Court is confident that the Minnesota Supreme Court would not recognize

the "right to self-determination" asserted by the Saliers.[2]  Their claim for violation of

that "right" is therefore dismissed.

### C. *Intentional Infliction of Emotional Distress*

The Saliers' second cause of action is for intentional infliction of emotional

distress ("IIED").  A defendant is not liable under Minnesota law for IIED unless the

defendant's conduct was "extreme and outrageous"—meaning "so atrocious that it

passes the boundaries of decency and is utterly intolerable to the civilized community."

*Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 439 (Minn. 1983).  "The bar for

recovering on an IIED claim is high, as the Minnesota Supreme Court has 'sharply

limited' the tort 'to cases involving particularly egregious facts.'"  *Edison v. Nat'l R.R.*

*Passenger Corp.*, No. 20-CV-0614 (PJS/LIB), 2021 WL 2515516, at *10 (D. Minn. June 18,

2021) (quoting *Hubbard*, 330 N.W.2d at 439).  The conduct must be worse than

unreasonable; as this Court has noted, "[c]ivilized societies tolerate a lot of

_____

[2]For that reason, the Court will not certify this question to the Minnesota
Supreme Court.  "[A]bsent a 'close' question and lack of state sources enabling a
nonconjectural determination, a federal court should not avoid its responsibility to
determine all issues before it."  *Perkins v. Clark Equip. Co.*, 823 F.2d 207, 209 (8th Cir.
1987) (quoting *Shakopee Mdewakanton Sioux Cmty. v. City of Prior Lake*, 771 F.2d 1153,
1157 n.2 (8th Cir. 1985)).  This is not a close question.

unreasonable conduct." *Id.* (alteration in original) (quoting *Shank v. Carleton Coll.*, 232 F. Supp. 3d 1100, 1114 (D. Minn. 2017)). "'Insults, indignities, threats, annoyances, petty oppressions, or other trivialities' are not extreme and outrageous." *Id.* (quoting *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 865 (Minn. 2003)).[3]

As discussed at oral argument, the Court can imagine that there *might* be circumstances under which a pharmacist's refusal to dispense life-saving medicine to a severely ill patient because of the pharmacist's political beliefs (or because of a policy of the pharmacist's employer) could be extreme and outrageous. *See* ECF No. 35 at 40–41, 55. But this case does not remotely approach those circumstances. At the time that Walmart and Hy-Vee refused to provide ivermectin and hydroxychloroquine to the Saliers, every major medical authority and government agency that had addressed the issue had said that ivermectin and hydroxychloroquine should not be used to treat COVID-19.[4] Obviously, there is nothing extreme or outrageous about a pharmacist's

---

[3]Thus, the alleged "paternalist and rude lecture to Karla Salier about how she was endangering" her husband's health, ECF No. 9 ¶ 62, was not extreme or outrageous.

[4]*See, e.g.*, U.S. Food & Drug Admin., *Coronavirus (COVID-19) Update: FDA Revokes Emergency Use Authorization for Chloroquine and Hydroxychloroquine* (June 15, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update -fda-revokes-emergency-use-authorization-chloroquine-and; U.S. Food & Drug Admin., *FAQ: COVID-19 and Ivermectin Intended for Animals* (Apr. 26, 2021), https://www.fda.gov /animal-veterinary/product-safety-information/faq-covid-19-and-ivermectin-intended -animals; Ctrs. for Disease Control & Prevention, *Rapid Increase in Ivermectin*

(continued...)

following the advice of these authorities.  And nothing alleged by the Saliers makes

plausible their claim that the reason the pharmacists at Walmart and Hy-Vee refused to

fill their prescriptions was not that doing so would contravene the overwhelming

weight of medical authority, but because of political beliefs or corporate policies that

were unrelated to that authority.

 For these reasons, the Saliers have not plausibly alleged that defendants'

behavior was extreme and outrageous, and their IIED claims are dismissed.  *See*

*Twombly*, 550 U.S. at 570.

---

 [4](...continued)
*Prescriptions and Reports of Severe Illness Associated with Use of Products Containing
Ivermectin to Prevent or Treat COVID-19* (Aug. 26, 2021, 11:40 AM), https://emergency.cdc
.gov/han/2021/han00449.asp; Am. Med. Ass'n, *AMA, AphA, ASHP Statement on Ending
Use of Ivermectin to Treat COVID-19* (Sept. 1, 2021), https://www.ama-assn.org/press
-center/press-releases/ama-apha-ashp-statement-ending-use-ivermectin-treat-covid-19;
*see also DeMarco*, 263 A.3d at 435 (Sept. 24, 2021) ("Preeminent institutions representing
numerous facets of the national medical establishment, including the FDA, CDC, AMA,
World Health Organization, and Infectious Disease Society of America, have criticized
the use of ivermectin as a treatment for COVID-19.").

 The Court takes judicial notice that these authorities existed.  *See Mulvenon v.
Greenwood*, 643 F.3d 653, 656–57 (8th Cir. 2011) ("In addressing a motion to dismiss,
'[t]he court may consider . . . matters of public record.'" (first alteration in original)
(quoting *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010))); *Missourians for
Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (court may take judicial
notice of government websites); *Bishop v. Jesson*, No. 14-CV-1898 (ADM/SER), 2016 WL
8674584, at *14 n.12 (D. Minn. Feb. 12) (taking judicial notice of online press release on
motion to dismiss), *R&R adopted*, 2016 WL 906422 (D. Minn. Mar. 9, 2016).

*D.  Tortious Interference with Contractual Relations*

The Saliers' third cause of action is for tortious interference with contractual relations.  This tort comprises five elements under Minnesota law: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages."[5] *Cent. Specialties, Inc. v. Large*, 18 F.4th 989, 998 (8th Cir. 2021) (quoting *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994)).

The Saliers allege that defendants' refusal to dispense the drugs that Dr. James prescribed interfered with Dr. James's performance of her contract to treat the Saliers. That is not true; the Saliers conceded at oral argument that Dr. James did not, in fact, breach her contract with the Saliers, and nothing pleaded in the complaint suggests that anything done by defendants made it more difficult for Dr. James to fulfill her contractual obligations to the Saliers.  That in itself is fatal to the Saliers' claim.[6]

---

[5]One "element"—lack of justification—need not be proved by the plaintiff; rather, *presence* of justification is an affirmative defense.  *Sysdyne Corp. v. Rousslang*, 860 N.W.2d 347, 351 (Minn. 2015).

[6]The Eighth Circuit has not been clear whether, under Minnesota tortious-interference law, a plaintiff must prove an actual breach or whether it suffices to show that performance was made more difficult.  *See Cent. Specialties*, 18 F.4th at 998 (stating in dictum that a "breach" includes acts that make a contract's performance "more difficult, or prevents performance, or makes performance of a contract of less value to the promisee" (quoting *Cont'l Rsch., Inc. v. Cruttenden, Podesta & Miller*, 222 F. Supp. 190, 198 (D. Minn. 1963))); *but see E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 664–65

(continued...)

The Saliers have a second problem, which is that defendants took no affirmative action but instead merely refused to deal with the Saliers.  The Restatement (Second), after which the Minnesota Supreme Court has patterned tortious-interference law, *see, e.g.*, *Kjesbo*, 517 N.W.2d at 588; *Furlev Sales & Assocs. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 27 (Minn. 1982), specifically provides that "a mere refusal to deal" cannot give rise to liability for tortious interference with contractual relations. Restatement (Second) of Torts § 766 cmt. b (Am. Law Inst. 1979) ("Deliberately and at his pleasure, one may ordinarily refuse to deal with another, and the conduct is not regarded as improper, subjecting the actor to liability.").  Moreover, the Saliers have not cited any Minnesota case in which a mere refusal to deal was deemed to be tortious interference.  In all of the successful tortious-interference claims of which the Court is aware, the defendant took an affirmative action to procure a breach of contract.  *See, e.g.*, *Johnson v. Gustafson*, 277 N.W. 252, 253 (Minn. 1938) (inducing straw purchase of house to avoid paying realtor commission); *Royal Realty Co. v. Levin*, 69 N.W.2d 667, 670 (Minn. 1955) (inducing delay in execution of contract to buy property in order to buy it

---

[6](...continued)
(8th Cir. 2012) (observing that the Minnesota Supreme Court "expressly set forth the elements of a tortious interference claim to include procurement of a breach of contract" in *Furlev Sales & Assocs. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982), and that the court thereafter "has adhered to this recitation of the elements of tortious interference").  It does not matter here which one is the case, however, because the Saliers have not plausibly pleaded either.

for oneself first); *RSS Fridley, LLC v. Nw. Orthopaedic Surgeons P'ship*, No. A21-0664, 2022 WL 200359, at *3, *13 (Minn. Ct. App. Jan. 24, 2022) (inducing vendors to breach their contracts with plaintiffs by "providing unauthorized direction" to vendors, "placing unauthorized orders for products and services with such vendors," and "disparaging" plaintiffs).

Although the Saliers argue that defendants did more than simply refuse to deal, the complaint does not support that argument.  The Saliers have not alleged that defendants did anything other than refuse to fill their prescriptions (and explain why they were refusing to fill those prescriptions).  The complaint does not allege, for example, that defendants hindered their contract with Dr. James by preventing the Saliers from obtaining ivermectin from any of the thousands of other pharmacists in Minnesota and surrounding states.  Nor does the complaint allege that defendants threatened or exerted any type of economic pressure on the Saliers (by, for example, threatening to bar the Saliers from shopping at Walmart or Hy-Vee) in order to deprive them of the benefit of their contract with Dr. James.  *See* Restatement (Second) of Torts § 766 cmt. *l* (explaining how a refusal to deal may incur liability—"A may induce B to break his contract with C by threatening not to enter into, or to sever, business relations with B unless B does break the contract").  To the contrary, the Saliers pleaded that Hy-Vee "filled every other prescription that Dr. James issued."  ECF No. 9 ¶ 21.  Finally, the

Saliers identify no authority to explain why defendants' supposed failures to follow Minn. R. 6800.3110, subpt. 4 (2022)[7]—frequently highlighted in the Saliers' brief and at oral argument but never mentioned in the complaint—transform defendants' refusal to deal into tortious interference.

Once again, the Saliers seek to impose on medical providers affirmative duties that have never before been recognized by the common law. There is no reason to believe that the Minnesota Supreme Court would significantly expand the tort of tortious interference with contractual relations in the manner sought by the Saliers. Their claim is therefore dismissed.

### III.  FAILURE TO SERVE AN EXPERT-REVIEW AFFIDAVIT

Even if the Saliers had pleaded one or more plausible claims, the Court would be required to dismiss those claims. In Minnesota, if a plaintiff brings an action against a health-care provider—"whether [that action is] based on contract or tort"—and if that action alleges "malpractice, error, mistake, or failure to cure" and "includes a cause of action as to which expert testimony is necessary to establish a prima facie case," then "the plaintiff must . . . serve upon defendant with the summons and complaint an affidavit . . . ." Minn. Stat. § 145.682, subdiv. 2, 2(1). The affidavit, which "must be by the plaintiff's attorney," must state that

---

[7]The Saliers allege that Minn. R. 6800.3110, subpt. 4, required the pharmacists to consult with Dr. James before refusing to fill their prescriptions.

the facts of the case have been reviewed by the plaintiff's
attorney with an expert whose qualifications provide a
reasonable expectation that the expert's opinions could be
admissible at trial and that, in the opinion of this expert, one
or more defendants deviated from the applicable standard of
care and by that action caused injury to the plaintiff[.]

*Id.* § 145.682, subdiv. 3, 3(1).  "Failure to comply . . . within 60 days after demand for the

affidavit results, upon motion, in mandatory dismissal with prejudice of each cause of

action as to which expert testimony is necessary to establish a prima facie case."  *Id.*

§ 145.682, subdiv. 6(a).

It is undisputed that the Saliers' counsel failed to serve this affidavit with the

summons and complaint; that defendants then made a demand for the affidavit, ECF

No. 28 at 26; and that the Saliers' counsel did not comply with that demand within

60 days, ECF No. 35 at 33.  At oral argument, the Saliers' counsel claimed that he found

an expert (whom he did not identify) with the appropriate qualifications willing to give

the required opinion but that the expert's workload had made it difficult for counsel to

contact him.  *Id.*  Counsel also said that he had been trying to find another expert, but

his efforts had "come up empty."  *Id.*  Counsel asked for an extension of the deadline to

provide the necessary affidavit.  *Id.*

*A. Statutory Scope*

Save for a brief comment about their IIED claim, the Saliers did not dispute at oral argument that all of their claims fall within the scope of Minn. Stat. § 145.682. *See* ECF No. 35 at 33–35, 60. But even if the Saliers had not conceded the point, the Court would conclude that the statute embraces all of the Saliers' claims.

"[T]he statute's applicability is conditioned upon a finding that expert testimony is necessary to establish a prima facie case of malpractice." *Chizmadia v. Smiley's Point Clinic*, 873 F.2d 1163, 1165 (8th Cir. 1989). The statute also covers claims—even those not styled as medical-malpractice claims—that contain "any allegations of malpractice, mistake, or failure to cure." *Paulos v. Johnson*, 502 N.W.2d 397, 400 (Minn. Ct. App. 1993) (alleged "negligent nondisclosure" by health-care provider covered by statute because "determination of causation and damages would rest on technical medical concepts"). "[C]ases in which an affidavit of expert review are not required are rare and exceptional." *Kolosky v. Woodwinds Hosp.*, No. A09-667, 2009 WL 4251139, at *2 (Minn. Ct. App. Dec. 1, 2009) (citing *Tousignant v. St. Louis Cnty.*, 615 N.W.2d 53, 58 (Minn. 2000)). Expert testimony is necessary unless "the matters to be proved fall within an area of common knowledge and developing lay comprehension of medical techniques." *Chizmadia*, 873 F.2d at 1165 (quoting *Hestbeck v. Hennepin Cnty.*, 212 N.W.2d 361, 364 (Minn. 1973)).

Each of the Saliers' claims is subject to Minn. Stat. § 145.682 because each requires evidence that defendants violated the standard of care applicable to pharmacists. The Saliers ground each cause of action on the allegation that defendants lacked a "reasonable medical or scientific basis for declining to fill" the prescriptions or on the allegation that defendants substituted their own opinions for "Dr. James' reasoned and qualified judgment" and "knowledge, skills, ability, and experience." ECF No. 9 ¶¶ 42, 47, 53, 60–61, 67, 72, 76, 81, 87, 93–94, 99, 104. The Saliers also allege that defendants "endangered" or put at risk the Saliers' lives or health. *Id.* ¶¶ 43, 48, 53, 60–61, 68, 73, 77, 82, 87, 93–94, 100, 105. Finally, in order to show causation, the Saliers would have to demonstrate that their prescriptions would have been filled but for the allegedly tortious conduct, and that would require the Saliers to show that filling their prescriptions was consistent with the standard of care. *See Paulos*, 502 N.W.2d at 400.

None of this evidence would be within "common knowledge and developing lay comprehension." *Chizmadia*, 873 F.2d at 1165 (quoting *Hestbeck*, 212 N.W.2d at 364). The use of ivermectin or hydroxychloroquine in treating COVID-19 is not comparable to leaving a surgical sponge inside a patient's body or amputating the wrong limb. Any juror would know that the latter are not within the surgical standard of care. *See Kolosky*, 2009 WL 4251139, at *2; *Tineo v. Fed. Bureau of Prisons*, No. 05-CV-0724 (ADM/SRN), 2005 WL 1745451, at *2 n.2 (D. Minn. July 22, 2005). But whether treating

-18-

COVID-19 with ivermectin or hydroxychloroquine is within the standard of care is not something that a juror could determine without expert assistance.

Thus, because the testimony of a medical expert is necessary to establish a prima facie case for each of the Saliers' claims, the requirements of Minn. Stat. § 145.682 apply to those claims.

### B.  Excusable Negligence

The Court may extend the 60-day time limit under Minn. Stat. § 145.682, subdiv. 4(b) only for excusable neglect.  *See LeSure v. Cima*, No. 21-CV-0368 (MJD/JFD), 2021 WL 6755000, at *3 (D. Minn. Nov. 15, 2021), *R&R adopted*, 2022 WL 283035 (D. Minn. Jan. 31, 2022).  "Excusable neglect exists where the plaintiff (1) has a reasonable suit on the merits, (2) has a reasonable excuse for failure to comply with [the] time limit set forth by Minn. Stat. § 145.682, subd. 2, (3) acted with due diligence after receiving notice of the time limit, and (4) no substantial prejudice results to the defendant."  *Id.* (alteration in original) (quoting *Anderson v. Rengachary*, 608 N.W.2d 843, 850 (Minn. 2000)).

As the Court has just held, the Saliers do not have a "reasonable suit on the merits," *id.* (quoting *Anderson*, 608 N.W.2d at 850); they have not come close to pleading a viable claim.  In addition, the Saliers' attorney does not have "a reasonable excuse for failure to comply with [the] time limit set forth by Minn. Stat. § 145.682, subd. 2" and

has not "acted with due diligence after receiving notice of the time limit." *Id.* (quoting

*Anderson*, 608 N.W.2d at 850). Again, the Saliers' counsel claimed at the hearing that he

*had* found a doctor who told counsel that he was willing to give the required opinion,

but counsel said that he "had incredible difficulty" getting in contact with that doctor

because of the doctor's workload. ECF No. 35 at 33. But that does not excuse counsel's

failure to provide the required affidavit. At the pleadings stage, Minnesota law requires

only that the plaintiff's *attorney* provide an affidavit that he had conferred with a

qualified expert who opined that defendants failed to meet the applicable standard of

care. Minn. Stat. § 145.682, subdivs. 2(1), 3. No affidavit from the *expert* is required

until discovery. *Id.* § 145.682, subdivs. 2(2), 4. If what counsel said at the hearing is

true, then nothing has prevented him from drafting, signing, and serving the required

affidavit.

In sum, Minn. Stat. § 145.682 required the Saliers to provide an attorney affidavit

within 60 days of defendants' demand. The Saliers failed to do so, and they have not

demonstrated excusable neglect. Thus, even if the Saliers' claims were viable, those

claims would have to be dismissed with prejudice.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED that:

1.      Defendants' motions to dismiss [ECF Nos. 17, 20] are GRANTED.

2.      Plaintiffs' amended complaint [ECF No. 9] is DISMISSED WITH

PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  August 19, 2022                    s/Patrick J. Schiltz
                                           Patrick J. Schiltz, Chief Judge
                                           United States District Court